IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

AZZ, INC. and THE CALVERT    *
COMPANY, INC.,               *
                             *
        Plaintiffs,          *
                             *
        v.                   *        CV 119-052
                             *
SOUTHERN NUCLEAR OPERATING   *
COMPANY, INC.; GEORGIA POWER *
COMPANY; OGLETHORPE POWER    *
CORPORATION; MUNICIPAL       *
ELECTRIC AUTHORITY OF GEORGIA; *
THE CITY OF DALTON, GEORGIA; *
and WECTEC GLOBAL PROJECT    *
SERVICES, INC., n/k/a STONE & *
WEBSTER, INC.,               *
                             *
        Defendants.          *
                             *

_____

**O R D E R**

_____

        Before the Court are the following motions: (1) AZZ, Inc.

("AZZ") and the Calvert Company, Inc.'s ("Calvert") (collectively,

"Plaintiffs") motion for summary judgment (Doc. 104); (2)

Plaintiffs' motion to exclude testimony of Eric Guyer (Doc. 106);

(3) Plaintiffs' motion to exclude testimony of Alex Kattamis (Doc.

107); (4) Plaintiffs' motion to exclude testimony of Paul Britton

(Doc. 108); (5) Plaintiffs' motion to exclude testimony of

Christopher Tierney (Doc. 109); (6) Georgia Power Company's, for

itself and as agent for Oglethorpe Power Corporation, Municipal

Electric Authority of Georgia, and the City of Dalton, Georgia,

(collectively, the "Owners" and, together with Southern Nuclear Operating Company, Inc. ("SNC"), the "Vogtle Defendants") motion for summary judgment and motion for partial summary judgment (Doc. 116); (7) the Vogtle Defendants' motion to exclude testimony of Chathan Cooke (Doc. 111); (8) the Vogtle Defendants' motion to exclude testimony of Javier Cruz (Doc. 112); (9) the Vogtle Defendants' motion to exclude testimony of Patrick Donohoe (Doc. 113); (9) Vogtle Defendants' motion to exclude testimony of Steven Hoisington (Doc. 114); (10) WECTEC Global Project Services, Inc., n/k/a Stone & Webster, Inc.'s ("WECTEC") motion for summary judgment and motion for partial summary judgment (Doc. 119); and (11) WECTEC's motion to exclude Chathan Cooke, Javier Cruz, Patrick Donohoe, and Steven Hoisington (Doc. 115).  For the following reasons, Plaintiffs' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**; Plaintiffs' motion to exclude Mr. Britton is **DENIED**; Plaintiffs' motions to exclude Dr. Guyer and Dr. Kattamis are **GRANTED IN PART** and **DENIED IN PART**; Plaintiffs' motion to exclude Mr. Tierney is **DENIED WITHOUT PREJDUICE;** the Vogtle Defendants' motion for summary judgment is **GRANTED** and motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART**; the Vogtle Defendants' motions to exclude Dr. Cruz and Dr. Donohoe are **GRANTED;** the Vogtle Defendants' motions to exclude Dr. Cooke and Mr. Hoisington are **GRANTED IN PART** and **DENIED IN PART;** WECTEC's motions for summary judgment and partial summary judgment are

**DENIED AS MOOT**; and WECTEC's motions to exclude Dr. Cruz and Dr. Donohoe are **GRANTED;** WECTEC's motion to exclude Dr. Cooke and Mr. Hoisington is **GRANTED IN PART** and **DENIED IN PART.**

## I. BACKGROUND

This case arises out of the engineering, procurement, construction and startup of two nuclear reactors (Unit 3 and Unit 4) at the Alvin W. Vogtle Electric Generating Plant ("Plant Vogtle") near Waynesboro, Georgia (the "Vogtle Project").

**A. The Relevant Agreements**

In 2008, the Vogtle Defendants entered into an Engineering, Procurement and Construction Agreement (the "EPC Agreement") with Westinghouse Electric Company, LLC ("Westinghouse") and Stone & Webster, Inc. ("S&W"), a Shaw Group Company ("Shaw"), for the Vogtle Project. (Doc. 104-1, at 2; Doc. 116-1; at 2.) In 2011, S&W entered into four purchase orders ("Purchase Orders") with Calvert related to the manufacture of the electrical bus system goods ("Bus System Goods") for the Vogtle Project and certain services, such as providing structural steel support for the installation of those goods.[1] (Doc. 104-1, at 3; Doc. 116-1 at 3.) Two of the Purchase Orders were for the manufacture of the

---

[1] Plaintiffs contend that Shaw entered into the Purchase Orders, but upon review of the Purchase Orders, the Court finds that S&W, as a Shaw Group Company, entered into the Purchase Orders. (Doc. 104-1, at 3; Doc. 195-2, at 2; Doc. 195-3, at 2; Doc. 195-4, at 2; Doc. 195-5, at 2.)

3

isophase bus ("IPB") goods ("IPB Purchase Orders"), and the other two were for the manufacture of the non-segregated phase bus ("NSPB") goods ("NSPB Purchase Orders"). (Doc. 104-1, at 3; Doc. 116-1 at 3.) On December 10, 2015, AZZ, a Mississippi corporation, and S&W, as a subsidiary of Chicago Bridge & Iron Company ("CB&I"),[2] entered into a subcontract under which AZZ agreed to provide certain services as part of the Vogtle Project (the "Vogtle Subcontract"). (Doc. 104-1, at 5; Doc. 116-1, at 5.)

## B. The Electrical Bus System

The Bus System Goods that Plaintiffs were to provide under the Purchase Orders would be used for the construction of the two nuclear power generation units, Unit 3 and Unit 4, at Plant Vogtle. (Doc. 116-1, at 7; Doc. 135, at 11-12.) Unit 3 and Unit 4 "require[] a local, high-current, power distribution system which includes an electrical bus system." (Doc. 116-1, at 7; Doc. 135, at 12.) "This bus system contained three components: a [NSPB] system, an [IPB] system, and a forced air cooling system." (Doc. 116-1, at 7; Doc. 135, at 12.) "The forced air cooling system forces air through the [IPB] system which is connected to the [NSPB] system thus allowing it to also supply air to the [NSPB] system." (Doc. 116-1, at 7; Doc. 135, at 12.) The NSPB system is an assembly of the NSPB goods, or NSPB bars, that carry electric

---

[2] In 2012, CB&I acquired Shaw/S&W by merging the two entities into an existing CB&I subsidiary, Crystal Acquisition Subsidiary, Inc. (Doc. 116-1, at 4.)

current when in operation.  (Doc. 116-1, at 7-8; Doc. 135, at 12.)
Because of this function, the NSPB bars were to be insulated with
epoxy coating.  (Doc. 116-1, at 10; Doc. 135, at 14.)

Plaintiffs had three "recipes" (or as the Vogtle Defendants
refer to them, "Generations") for their coating process.  (Doc.
116-1, at 12; Doc. 135, at 17.)  According to Plaintiffs, "'Pre-
Generation 1[]' was a production 'recipe' used in an early initial
run of aluminum bus bars[, but t]hese bus bars were never shipped
to Shaw."  (Doc. 135, at 17.)   Second, "'Generation 1' was a
modified production 'recipe' that was used for part of the Unit 3
[NSPB bars] . . . in or around February of 2013."  (Id.)   Third,
"'Generation 2' generally was a 'recipe' used thereafter for the
balance of the Unit 3 [NSPB bars] and Unit 4 [NSPB bars]."  (Id.)

The Parties dispute whether the epoxy coating was supposed to
adhere to the surface of the NSPB bars and whether any delamination
or cracking rendered the bus bars defective.  (Doc. 105, at 3-6;
Doc. 122, at 5-6.)  According to Plaintiffs, the NSPB bars complied
with the "codes, standards and specifications" required by the
Purchase Orders and the epoxy coating did not have to adhere to
the NSPB bars, rather the NSPB bars only had to be "encased" with
epoxy.  (Doc. 105, at 4; Doc. 139, at 10.)  Plaintiffs also contend
that any delamination was not a defect.  (Doc. 139, at 9.)
According to the Vogtle Defendants, the NSPB bars with delaminated
and/or crack epoxy coatings were defective because the epoxy

coating was intended to adhere to the bus bars and "act[] as an electrical insulator preventing electric discharge between bus bars and between the bus bars and metal enclosure." (Doc. 116-1, at 10.)

## C. Bankruptcy Court Proceedings and Commencement of Lawsuit

On March 29, 2017, Westinghouse and its affiliates, including WECTEC (collectively, the "Debtors") filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") for relief under Chapter 11 of the Bankruptcy Code. See In re Westinghouse Elec. Co., No. 17-10751 (Bankr. S.D.N.Y.); (Doc. 104-1, at 6; Doc. 116-1, at 5.) On March 29, 2017, the Bankruptcy Court entered an Interim Assessment Agreement ("IAA") between the Debtors and the Owners, under which the Owners agreed to pay all costs accrued by the Debtors for services performed and goods provided by subcontractors to the Vogtle Project during the Interim Assessment Period. (Doc. 104-1, at 6-7; Doc. 116-1, at 5-6.) The Interim Assessment Period began on March 29, 2017 and was extended eight times before terminating on July 27, 2017. (Doc. 104-1, at 8; Doc. 116-1, at 6.) By virtue of the IAA, Defendant WECTEC is not responsible for any costs relating to Plaintiffs' work on the Vogtle Project that accrued during the Interim Assessment Period. (Doc. 104-1, at 6-7; Doc. 116-1, at 5-6.)

On June 9, 2017, the Owners, WECTEC, and Westinghouse entered into a services agreement, pursuant to which WECTEC and Westinghouse transferred control of the construction of the Vogtle Project to the Owners. (Doc. 135, at 8.) On July 27, 2017, the Debtors rejected the Vogtle Subcontract as part of the bankruptcy proceeding. (Doc. 104-1, at 8; Doc. 116-1, at 6.) On the same day, SNC, acting for itself and as agent for the Owners, entered into a Subcontractor Bridge Agreement (the "Bridge Agreement") with Calvert, pursuant to which Calvert agreed to provide all labor, materials, equipment, and services for the Vogtle Project to the same extent contemplated by the Vogtle Subcontract. (Doc. 104-1, at 8-9; Doc. 116-1, at 6.) SNC and the Owners agreed to pay Calvert for that work. (Doc. 104-1, at 8-9; Doc. 116-1, at 6.) According to Plaintiffs, Calvert performed its duties under the Vogtle Subcontract and Bridge Agreement. (Doc. 104-1, at 9-10.) On October 6, 2017, SNC provided notice of its intent to terminate the Bridge Agreement, effective November 6, 2017. (Doc. 145, at 18-19.) By virtue of the Bridge Agreement, Defendant WECTEC is not responsible for any costs relating to Plaintiffs' work on the Vogtle Project that accrued between July 27, 2017 and November 6, 2017. (Doc. 104-1, at 8-9; Doc. 116-1, at 6.)

According to Plaintiffs, a total of eight invoices (Invoices 7521, 7581, 7582, 7615, 7630, 7631, 7661, and 7713) for work performed under the IAA, the Vogtle Subcontract, and the Bridge

Agreement remains unpaid. (Doc. 104-1, at 12-13; Doc. 105, at 15-16.)   On February 16, 2018, Plaintiffs filed a lawsuit as an Adversary Complaint in the Bankruptcy Court, alleging six claims arising from the failure to pay the above-referenced invoices. (Doc. 104-1, at 11; Doc. 116-1, at 6.)   On April 30, 2018, the Bankruptcy Court entered a "Stipulation, Agreement and Order Between Debtors and Vogtle Owners Regarding Adversary Complaint" (the "Stipulation"), pursuant to which the Owners agreed to defend and indemnify WECTEC against Plaintiffs' claims related to the Vogtle Project asserted against WECTEC (Counts I and II of Plaintiffs' Complaint), and to be fully liable for any payments required in connection with any settlement of such claims.   See AZZ, Inc., et al. v. Southern Nuclear Operating Company, No. 18-01016, Doc. 14 (Bankr. S.D.N.Y. Apr. 30, 2018); (Doc. 8-4).   Also pursuant to the Stipulation, WECTEC assigned all of WECTEC's claims against Plaintiffs related to services performed or goods provided in relation to the Vogtle Project on or after March 29, 2017, and all warranties related to those goods and services to the Owners. (Id.)   On April 29, 2018, the Vogtle Defendants filed their Answer to Plaintiffs' Complaint in the District Court of the Southern District of New York ("SDNY Court"), which contained numerous counterclaims. (Doc. 8-5.)   On March 25, 2019, the SNDY Court granted Defendants' motion to transfer the case to this Court and

to withdraw the bankruptcy reference.[3]  (Doc. 17.)  On January 2, 2020, the Vogtle Defendants filed their first amended counterclaims, incorporating the paragraphs in their first counterclaims.  (Doc. 68.)  These counterclaims allege, among other things, that Plaintiffs breached the Vogtle Subcontract and Bridge Agreement, and were negligent in their construction and design relating to the Vogtle Project.  (Doc. 8-5, at 43-48; Doc. 68, at 10-12.)

## II. MOTIONS TO EXCLUDE

Preliminarily, both Plaintiffs and Defendants move to exclude each other's experts.  The Court addresses the motions below.

### A. Legal Standard

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

---

[3] The SDNY Court only transferred Plaintiffs' Count I, II, V, and VI, and the Vogtle Defendants' initial counterclaims filed on April 29, 2018.  (Doc. 17.) Therefore, the Court does not address Plaintiffs' Count III and IV in its summary judgment analysis.

"As the Supreme Court recognized in <u>Daubert v. Merrell Dow Pharms.,</u> <u>Inc.</u>, [509 U.S. 579, 589 (1993)], Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of [expert] testimony." <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK</u> <u>Ltd.</u>, 326 F.3d 1333, 1340 (11th Cir. 2003). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1306 (11th Cir. 1999).

The Eleventh Circuit has explained that district courts are to engage in a three-part inquiry to determine the admissibility of expert testimony under Rule 702. <u>Quiet Tech.</u>, 326 F.3d at 1340. Specifically, the court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Id.</u> at 1340-41 (citations omitted).

First, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education. <u>Trilink Saw</u> <u>Chain, LLC v. Blount, Inc.</u>, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (citation omitted). "A witness's qualifications must correspond to the subject matter of his proffered testimony."

<u>Anderson v. Columbia Cnty.</u>, No. CV 112-031, 2014 WL 8103792, at *7 (S.D. Ga. Mar. 31, 2014) (citing <u>Jones v. Lincoln Elec. Co.</u>, 188 F.3d 709, 723 (7th Cir. 1999)).   However, an expert's training need not be narrowly tailored to match the exact point of dispute. <u>McDowell v. Brown</u>, 392 F.3d 1283, 1297 (11th Cir. 2004).

Second, the testifying expert's opinions must be reliable. In <u>Daubert</u>, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93.   There are four factors that courts should consider: (1) whether the theory or technique can be tested, (2) whether it has been subject to peer review, (3) whether the technique has a known or potential rate of error, and (4) whether the theory has attained general acceptance in the relevant community. <u>Id.</u> at 593-94.   "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." <u>United States v. Frazier</u>, 387 F.3d 1244, 1262 (11th Cir. 2004) (citation omitted). For example, experience-based experts need not satisfy the factors set forth in <u>Daubert</u>. See <u>United States v. Valdes</u>, 681 F. App'x 874, 881 (11th Cir. 2017) (affirming admission of testimony from

11

expert identifying firearms based upon years of experience working with firearms). However, "[t]he inquiry is no less exacting where the expert 'witness is relying solely on experience' rather than scientific methodology." Summit at Paces, LLC v. RBC Bank, No. 1:09-cv-03504, 2012 WL 13076793, at *2 (N.D. Ga. May 22, 2012) (quoting FED. R. EVID. 702, advisory committee's notes to 2000 amendment)). Bearing in mind the diversity of expert testimony, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). "[W]hether the proposed testimony is scientifically correct is not a consideration for this court, but only whether or not the expert's testimony, based on scientific principles and methodology, is reliable." In re Chantix Prods. Liab. Litig., 889 F. Supp. 2d 1272, 1280 (N.D. Ala. 2012) (citing Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (citations omitted and alterations adopted).

Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590. In

most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." FED. R. EVID. 702, advisory committee's notes to 2000 amendment. "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, "if the witness is relying solely or primarily on experience, then the witness must explain _how_ that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation omitted) (alterations in original).

Third, expert testimony must assist the trier of fact to decide a fact at issue. The Supreme Court has described this test as one of "fit." Daubert, 509 U.S. at 591. To satisfy this requirement, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. Id.; Frazier, 387 F.3d at 1262. Yet, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier,

387 F.3d at 1262-63.  Using these standards, the Court will address the Parties' motions in turn.

**B. Plaintiffs' Motions to Exclude Vogtle Defendants' Experts**

    1. <u>Eric Guyer</u>

    Plaintiffs move to exclude three opinions of Dr. Eric Guyer, the Vogtle Defendants' expert, pursuant to Federal Rules of Evidence 401, 403, 702, 703 and Federal Rules of Civil Procedure 26(a)(2)(B).  (Doc. 106, at 1.)  The Vogtle Defendants offer Dr. Guyer "to evaluate the delamination and cracking of the epoxy coating on [Plaintiffs'] bus bars." (Doc. 137, at 2.)  Dr. Guyer has a Bachelor of Science in Chemical Engineering from Iowa State University, a Master of Science in Materials Science and Engineering from Stanford University, a Ph.D. in Materials Science and Engineering from Stanford University, and is a licensed professional engineer in Mechanical Engineering and Metallurgical Engineering.  (Doc. 181-6, at 70.)  He specializes in "failure analysis, metallurgy, materials science, adhesion science, fracture and fatigue of materials, material degradation, and material deformation, as well as paints and protective coatings." (<u>Id.</u>)  He is a National Association of Corrosion Engineers Certified Coatings Inspector and has experience analyzing paint and protective-coating systems applied to steel, aluminum, and other materials.  (<u>Id.</u>)

Dr. Guyer's expert report offers opinions on the causation of the epoxy delamination on the bus bars and Plaintiffs' efforts to remediate the delamination. (Id. at 101-102.) Specifically, Dr. Guyer opines that the delamination or cracking of the epoxy on the bus bars was caused by inadequate surface preparation and under curing the epoxy coating. (Id. at 89.) He also opines that Plaintiffs' efforts to remediate the incidents of epoxy cracking or delamination were ineffective. (Id. at 102) Plaintiffs argue that Dr. Guyer is not qualified, his opinions are not reliable, and his opinions are irrelevant. (Doc. 106.) The Vogtle Defendants oppose the motion. (Doc. 137.)

   a. *Qualification*

First, Plaintiffs argue Dr. Guyer is not qualified to testify to "what 'adequate' adhesion or strength of the epoxy insulation was required under the [NSPB g]oods specifications." (Doc. 106, at 4.) Plaintiffs contend that the contract specifications determine what is adequate, but rather than use the contract specifications, Dr. Guyer relies on three Institute of Electrical and Electronics Engineers ("IEEE") standards to make his determinations. (Id. at 6.) Plaintiffs argue Dr. Guyer is not qualified to testify on IEEE standards because he is not an electrical engineer. (Id. at 6-7.) The Vogtle Defendants contend that Plaintiffs' argument as it relates to the contract specifications is not a challenge to Dr. Guyer's qualifications

but to the reliability and relevancy. (Doc. 137, at 9.) The Court agrees and addresses the reliability and relevancy challenges in their respective sections. As for the arguments related to the IEEE standard, the Vogtle Defendants argue that Dr. Guyer is not providing opinions on the IEEE itself but is applying the IEEE standards to opine on the mechanical properties of the epoxy and causation of the delamination and cracking. (Id. at 8-9.) Defendants contend that the IEEE standards are used by both electrical and mechanical engineers. (Id. at 9.) Moreover, the Vogtle Defendants argue that Dr. Guyer "regularly applies his experience and expertise to investigations regarding failure analysis, metallurgy, materials science, adhesion science and material degradation[, which include] conducting root cause investigations relating to consumer products and industrial systems." (Id. at 7.) Based on Dr. Guyer's education and experience, he is qualified to apply the IEEE standards to offer expert testimony on the mechanical properties of the epoxy and causation of the delamination and cracking.

Similarly, Plaintiffs argue that Dr. Guyer is not qualified to opine on the National Electric Code ("NEC") standards because he has not testified about NEC standards, he has no expertise to interpret electrical standards, and his opinion is nothing more than what lawyers can argue in closing arguments. (Doc. 106, at 11.) The Vogtle Defendants argue that his training and education

16

as a materials engineer and metallurgist and his experiences related to delamination and cracking of materials qualify him to opine "as to the requirements for the mechanical properties of the insulation on the bus bar." (Doc. 137, at 10.) Plaintiffs third argument goes to the helpfulness of Dr. Guyer's opinion, but the Court finds that the interpretation of a technical standard is proper expert testimony. However, as for his qualifications, the Court finds that Dr. Guyer is not qualified to offer expert testimony on the NEC. Dr. Guyer's opinions go beyond that of a materials engineer and metallurgist opining on the requirements for the mechanical properties of the bus bar insulation, but instead go to the effect of using bus bars with delaminated and/or cracked epoxy. (See Doc. 181-6, at 74 ("the [NEC] requires equipment to operate damage-free, and the equipment integrity must not adversely affect safe operation of the equipment") (citation omitted).)

Lastly, Plaintiffs argue that Dr. Guyer is not qualified because he has no experience in bus bar manufacturing. (Doc. 106, at 7.) However, the Court agrees with the Vogtle Defendants that "an expert's training need not be narrowly tailored to match the exact point of dispute." (Doc. 137, at 10 (quoting Evanston Ins. Co. v. Xytex Tissue Servs., LLC, 378 F. Supp. 3d 1267, 1278-79 (S.D. Ga. 2019)).) Although Dr. Guyer's training is not narrowly tailored to bus bar manufacturing, he has experience "regularly

conduct[ing] analyses of paint and protective-coating systems applied to a wide variety of steel, aluminum, plastic, composite, wood, and cementitious structures." (Doc. 181-6, at 70.) Therefore, based on his training and experience with coatings, Dr. Guyer is qualified to provide his expert opinions.

   b. *Reliability*

Second, Plaintiffs challenge Dr. Guyer's methodology concerning the causation of the delamination and cracking of the epoxy coating and Plaintiffs' remediation efforts as unreliable. (Doc. 106, at 11, 13, 15-21, 22.) Plaintiffs also challenge the reliability of Dr. Guyer's opinions regarding surface preparation and curing because he did not perform any testing and the IEEE and NEC standards do not set requirements for adhesion, rather, the contract specifications do. (Id. at 13.)

The Vogtle Defendants argue that Dr. Guyer's opinions related to the causation of the epoxy delamination and cracking on the bus bars and Plaintiffs' remediation efforts are reliable because they are based on a methodology where "he utilized his experience, reference[d] appropriate peer-reviewed scientific literature and applied his experience to the facts and evidentiary record, and explained how . . . the application of his experience to the facts of the case led to his conclusions." (Doc. 137, at 11-12.) The Vogtle Defendants argue that Dr. Guyer "described the fundamentals of coating adhesion" through citing peer-reviewed literature in

18

the field of materials science.   (Id. at 12-13.)   Additionally, the Vogtle Defendants contend that Dr. Guyer performed inspections of stored aluminum bus bars manufactured by Plaintiffs to form his opinions and reviewed the record evidence, including fact witness deposition transcripts, Plaintiffs' root cause analysis reports and photographs taken during the analysis, emails concerning the delamination and adhesions, and project specifications.   (Id.) Based on Dr. Guyer's experience, reliance on peer-reviewed scientific literature, and analysis of the record, the Court finds that Dr. Guyer employed a reliable methodology to form his opinions related to the causation of the epoxy delamination and cracking on the bus bars.  As for Plaintiffs' challenge to Dr. Guyer's opinion regarding surface preparation and curing, the Vogtle Defendants argue that Dr. Guyer is not required to perform testing on the bus bars because he can use his experience-based methodology to form his opinions on what is required for surface preparation and curing because "he can apply the principles described in his report and the record evidence."   (Doc. 137, at 14.)   The Court finds that Dr. Guyer's opinions related to surface preparation and curing are reliable because he employed an experience-based methodology where he used experience in materials science, review of the record evidence, and physical inspection of the bus bars to form his opinions.

Accordingly, the Court finds Dr. Guyer's opinions that Plaintiffs "failed to adequately prepare the surface of the bus bars and cure the bus bars and could not remediate the admitted deficiencies in their electrical bus systems" are reliable because these opinions are based on his training, experience, and review of the record.[4]

c. *Relevancy*

Lastly, Plaintiffs challenge the relevancy of Dr. Guyer's opinions. (Doc. 106, at 12, 15, 21-22, 24-25.) The Vogtle Defendants contend that most of Plaintiffs' arguments challenging the relevancy of Dr. Guyer's opinions are "improper summary judgment arguments aimed at the viability of the various claims." (Doc. 137, at 21.) The Court agrees with the Vogtle Defendants because Plaintiffs' challenges mirror the arguments raised in their motion for summary judgment. Plaintiffs also argue that Dr. Guyer's opinion regarding a standard of epoxy adhesion is irrelevant and confusing because the design specifications or

---

[4] Plaintiffs raise several other arguments to challenge the reliability of Dr. Guyer's opinion: (1) Dr. Guyer cannot point to the adequate amount of curing; (2) his reliance on a test conducted by AkzoNobel is unreliable if he does not know details about the test; (3) Dr. Guyer inspected materials that were not representative of the bus bars at the time of Shaw's acceptance; and (4) his opinion that delamination is a defect is based on a "misreading of electrical engineering standards. (Doc. 106, at 14, 16-19.) But the Court agrees with Defendants that these challenges to Dr. Guyer's opinions do not impact the admissibility, but rather go to the credibility of his opinions. (Doc. 137, at 19-20); Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th Cir. 1987) ("[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").

Purchase Orders do not require any adhesion. (Doc. 106, at 4-5.) In response, the Vogtle Defendants argue their claims are not just based on the Purchase Orders, and even so, the design specifications and Purchase Orders incorporate "general industry standards, codes and other performance requirements" that require adhesion. (Doc. 137, at 23.) Because the design specifications and Purchase Orders incorporate additional standards, Dr. Guyer's testimony related to whether adhesion was required is relevant. Moreover, the Vogtle Defendants argue that Dr. Guyer's testimony is helpful to a layperson because it involves materials science and the engineering for epoxy coating process and adhesion to an aluminum substrate. (Id. at 24-25.) Because the topic of delamination and efforts to prevent delamination are scientific in nature, the Court finds Dr. Guyer's opinions would assist an average layperson in determining what caused the delamination and cracking of the bus bars. Accordingly, Plaintiffs' motion to exclude Dr. Guyer (Doc. 106) is **GRANTED IN PART** as it relates to the NEC standards and **DENIED IN PART** as it relates to causation and remediation efforts.

### 2. Alex Kattamis

Plaintiffs move to exclude certain opinions of Dr. Alex Kattamis pursuant to Federal Rules of Evidence 401, 403, 702, 703 and Federal Rules of Civil Procedure 26(a)(2)(B). (Doc. 107, at 1.) The Vogtle Defendants offer Dr. Kattamis "to evaluate the

effect of the cracking and delamination of the [NSPB] bars on the bus system and whether [SNC]'s decision to replace the bus system was reasonable from an electrical engineering standpoint." (Doc. 136, at 2.)

Dr. Kattamis has his Bachelor's degree in Electrical Engineering from the University of Connecticut, Master's Degree from Princeton University, and Ph.D. in Electrical Engineering from Princeton University. (Doc. 128-4, at 18.) He is also a licensed professional engineer and is a certified fire and explosion investigator and a Senior Member of the IEEE. (Id. at 18-19.) Dr. Kattamis has experience with components of electrical bus systems and designing and implementing power distribution systems and current transformers. (Doc. 130-3, at 1078; Doc. 128-4 at 18.) Dr. Kattamis also has experience "investigating and evaluating bus-duct failures" through his work with Exponent, Inc., "a multidisciplinary engineering and science firm headquartered in Menlo Park, California." (Doc. 130-3, at 1038-41; Doc. 128-4 at 18.) The three opinions of Dr. Kattamis that Plaintiffs seek to exclude are:

> 1) The delamination and cracking of the epoxy rendered the [NSPB] sections defective and out of compliance with the contract and specifications. Moreover, continued installation of this defective [NSPB] would have led to a reduced lifetime and potential for catastrophic failure of the bus system and, thus, a danger to life and property.

2) The decision to replace the NSPB with [Copper Cable Bus] was reasonable as it would require reduced maintenance as compared to [NSPB] and [Copper Cable Bus] was being used at Vogtle Unit 1 ("U1") and Unit 2 ("U2") for over 30 years of operation without incident.

3) Ultimately due to a lack of faith in AZZ, and the difficulties with using multiple vendors to complete the electrical system, SNC and the Owners made a reasonable decision to use its new vendor to supply both the [Copper Cable Bus] and the [IPB].

(Doc. 107, at 2 (citing Doc. 128-4, at 17).)  Plaintiffs argue that Dr. Kattamis is not qualified, his opinions are not reliable, and his opinions are irrelevant.  (Doc. 107.)  The Vogtle Defendants oppose the motion.  (Doc. 136.)

        a. *Qualifications*

First, Plaintiffs argue Dr. Kattamis is not qualified to give Opinion 1 to the extent he opines the goods were defective because he "is an electrical engineer . . . not a materials engineer." (Doc. 107, at 5-6.)  Plaintiffs also argue Opinion 1 is not proper expert opinion because it "parrot[s] the opinions and conclusions of others." (Id. at 5.)  In response, the Vogtle Defendants argue that Dr. Kattamis' Opinion 1 is not "on the cause of [the] delamination . . . but is explaining the consequences of installing the defective material into the bus system" and that it is proper for Dr. Kattamis to rely on Dr. Guyer's opinions on the delamination and cracking.  (Doc. 136, at 8-9 (citing Amerisure Ins. Co. v. Auchter Co., No. 3:16-cv-407-J-39, 2017 WL 11629919, at *8 (M.D. Fla. Sept. 28, 2017).)  Although the Vogtle Defendants

23

are correct that an expert may rely on the opinion of another expert to form his expert opinions, he "may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." Hanson v. Colgate-Palmolive Co., 353 F. Supp. 3d 1273, 1292 (S.D. Ga. 2018) (citations and quotations omitted). Here, Dr. Kattamis did not simply adopt Dr. Guyer's findings that the bus bars were delaminated and cracked but also reviewed the record evidence and photographs Dr. Guyer relied on for his finding that the epoxy on the bus bars was cracking. (Doc. 128-4, at 31, 38.) Moreover, the Vogtle Defendants contend in their response, "Dr. Kattamis is not interpreting the contracts but is providing an electrical engineering opinion about the functionality of the bus system, or the lack thereof." (Doc. 136, at 15.) Therefore, even though the Court agrees that Dr. Kattamis is qualified to opine on the consequences of using bus bars with delamination and cracking and the delamination and cracking rendered the bus bars defective, he is not qualified to opine that the bus bars were "out of compliance with the contract and specifications" because contract compliance is a question for the jury. See Coyote Portable Storage, LLC v. PODS Enterprises, Inc., No. 1:09-CV-1152, 2011 WL 1870593, at *4 (N.D. Ga. May 16, 2011) ("The question of interpretation of the contract is for the jury, and the question of legal effect is for the judge. In neither case do we permit expert testimony.")

(citations omitted); see also Ala. Aircraft Indus., Inc. v. Boeing Co., No. 2:11-CV-03577, 2019 WL 13172372, at *8 (N.D. Ala. July 1, 2019) (excluding expert testimony on "compliance with [] contractual duties or the legal implications of conduct under those contracts or under any other standards or practices.") Accordingly, Dr. Kattamis' opinion must be limited only to the consequences of installing into the bus system defective bus bars with delamination and cracked epoxy and cannot include testimony that relates to contract compliance.

Additionally, Plaintiffs argue Dr. Kattamis is not qualified to give Opinions 2 and 3 relating to "business decisions made by SNC or the Owners." (Doc. 107, at 9.) Plaintiffs assert that his opinion on "'reasonableness' is not based on any expertise as an electrical engineer or his application of engineering principles." (Id. at 15.) The Vogtle Defendants argue Dr. Kattamis opines "on the decision from a construction and electrical engineering perspective." (Doc. 136, at 7.) The Vogtle Defendants assert "Dr. Kattamis does not need to have been a project manager or have 'credentials in quality control' to provide his opinions, particularly where he is not offering expert opinions on project management or quality control." (Id. at 8.) While the Court agrees that there may some engineering principles that go into determining whether NSPB goods could be replaced with Copper Cable Bus in Opinion 2, Dr. Kattamis goes beyond his expertise by

characterizing this decision as "reasonable." Although the Vogtle Defendants argue that "Dr. Kattamis has extensive experience with electric bus systems," this does not provide an explanation for how he is qualified to opine a decision was "reasonable." (See id.) Even more so in Opinion 3, the Vogtle Defendants fail to provide any plausible explanation as to why Dr. Kattamis, as an electrical engineer, is qualified to opine on the Vogtle Defendants' lack of faith in AZZ and reasonableness in choosing a new vendor. Because the Court finds Dr. Kattamis is not qualified to opine on the reasonableness of any decision, Opinion 2 is limited to whether NSPB goods could be replaced with Copper Cable Bus, and Opinion 3 is excluded.

      b. *Reliability*

Second, Plaintiffs challenge Dr. Kattamis' Opinion 1 as unreliable because the electrical standard he cites does not support his opinion that the NSPB bus was not in compliance with the standard.[5] (Doc. 107, at 8.) In response, the Vogtle Defendants argue that <u>Daubert</u> motions are not the proper method to challenge the expert's conclusions. (Doc. 136, at 15-16.) The Court agrees with the Vogtle Defendants; challenging an expert's conclusion as incorrect is more appropriate on cross examination.

---

[5] Plaintiffs also challenge his opinion that the NSPB bars were defective and out of compliance as unreliable because it was not based upon the application of any specific scientific engineering principles. (Doc. 107, at 4.) The Court does not address this argument because it has already found that Dr. Kattamis is not qualified to opine on contract compliance.

See In re Chantix Prods. Liab. Litig., 889 F. Supp. 2d at 1280. Dr. Kattamis is offering his opinion that the bus bars with delamination and cracking do not comply with the standards, which is a conclusion, and therefore, Plaintiffs' argument that the standard does not support this opinion is a challenge to the conclusion and not the methodology. Therefore, the Court finds Opinion 1, limited to the consequences of installing defective bus bars, is based on a reliable methodology based on Dr. Kattamis' education and experience as an electrical engineer, specifically his experience in investigating and evaluating bus-duct failures and conducting failure analyses on electrical bus systems, reliance on scientific literature, and review of the record evidence. (Doc. 136, at 10-13.)

c. *Relevance*

Lastly, Plaintiffs challenge Dr. Kattamis' Opinion 1 as irrelevant because it "seeks to tell the jury how they should decide an ultimate issue in the case without citing to [a] specific contractual requirement that is not met." (Doc. 107, at 7.) In response, the Vogtle Defendants argue that this is not a proper challenge to an expert's opinion. (Doc. 136, at 20-21 (citing Haines v. Webb, No. 1:13-CV-1783, 2014 WL 12828962, at *9 (N.D. Ga. Sept. 26, 2014)).) The Vogtle Defendants also contend that his opinion "is helpful to the jury because an average lay person would not know whether cracking and delaminated epoxy in an

27

electric bus system is defective." (Id. at 21.) While the Court agrees with the Vogtle Defendants that Dr. Kattamis may opine that the bus bars were defective, they fail to show why an expert's testimony is required to find a defective bus bar is "out of compliance" with the contract and specification. Nevertheless, based on the analysis above, Dr. Kattamis' Opinion 1 is already limited to the delamination and cracking rendering a bus bar defective and the consequences of installing those bus bars in an electrical bus system.

Plaintiffs also challenge Dr. Kattamis' Opinions 2 and 3 as irrelevant because they are not helpful to the jury and are unduly prejudicial. (Doc. 107, at 15-17.) However, the Court does not address Plaintiffs' relevancy or helpfulness challenges to Dr. Kattamis' Opinions 2 and 3 because, based on the analysis above, Dr. Kattamis is not qualified to opine on the reasonableness of the decisions. Accordingly, Plaintiffs' motion to exclude Dr. Kattamis (Doc. 107) is **GRANTED IN PART** as it relates to his opinions on contract compliance in Opinion 1, reasonableness in Opinion 2, and Opinion 3 and **DENIED IN PART** for the remaining testimony.

3. Christopher Tierney

Plaintiffs move to exclude certain opinions of Christopher Tierney pursuant to Federal Rules of Evidence 401, 403, 702, 703 and Federal Rules of Civil Procedure 26(a)(2)(B). (Doc. 109, at

1.) Despite citing to multiple grounds on which they seek exclusion, Plaintiffs only raise arguments challenging the relevancy of Mr. Tierney's opinions.[6] The Vogtle Defendants offer Mr. Tierney "to assess their economic damages incurred as a result of replacing the defective bus system supplied by [Plaintiffs]." (Doc. 140, at 2.) Mr. Tierney has over 35 years of experience in the construction industry, including determining proper economic damages. (Doc. 128-6, at 8.) He has a degree in Civil Engineering and a Master's in Business Administration. (Id.) Mr. Tierney is a Partner at HKA, Global, Inc. and was previously a Vice President, Chief Financial Officer, and Member of the Board of Directors at The Kenrich Group LLC. (Id. at 5, 7.) The Kenrich Group LLC "was a business and litigation consulting firm of engineering, accounting, financial and economic professionals with expertise and experience in the evaluation of economic damages and the determination of delays in the construction and other industries . . . [and] was acquired by [HKA, Global, Inc.] in July 2019." (Id. at 7 n.17.)

Mr. Tierney's expert report contains several opinions on damages to the Owners resulting from the replacement of the AZZ

---

[6] Plaintiffs clearly state in their motion that they are challenging the relevancy of Mr. Tierney's opinions. (Doc. 109, at 2.) However, in their reply to Defendants response, Plaintiffs challenge the methodology of Mr. Tierney's opinion. (Doc. 165, at 5-7.) Because this argument is being raised for the first time in a reply, it is not properly brought, and the Court will not consider these new arguments. See United States v. Oakley, 744 F.2d 1553, 1556 (11th Cir. 1984) ("Arguments raised for the first time in a reply brief are not properly before the reviewing court.").

bus system, avoided costs the Vogtle Defendants would have paid Plaintiffs had they completed the work, and damage mitigation. (Id. at 9-11.) Plaintiffs argue all or some of Mr. Tierney's opinions may become irrelevant upon resolution of their motion for summary judgment. (Doc. 109, at 2.) Plaintiffs contend "that the relevant scope of liability (if any) needs to be determined first in order to then assess whether [Mr.] Tierney presents a relevant opinion." (Id.) Plaintiffs do not challenge Mr. Tierney's qualifications or methodology, but rather raise several arguments to why his opinions are not relevant. (Id.) Specifically, Plaintiffs argue Mr. Tierney "is assuming that all of the figures that are contained in his expert report are recoverable by [the Vogtle Defendants]" and he "did not seek to take any contractual limitations on liability into account." (Id. at 5.) Plaintiffs also incorporate the arguments raised in their motion for summary judgment as reasons for why Mr. Tierney's opinions are not relevant. (Id. at 6-8.) In response, the Vogtle Defendants contend that Plaintiffs' arguments related to the limitations of liability in the contracts are not appropriate to raise in Daubert motions. (Doc. 140, at 7 (citing Jones Creek Invs., LLC v. Columbia Cnty., No. CV 111-174, 2013 WL 12141348, at *12 (S.D. Ga. Dec. 23, 2013)).) The Court agrees with the Vogtle Defendants that Plaintiff's assertions are not appropriate grounds for a motion to exclude. The Vogtle Defendants also assert that "[t]o

the extent the Court does limit the Vogtle [Defendants'] claims, Mr. Tierney's damages estimates can be tailored to the ruling." (Id.)  The Court again agrees; Mr. Tierney may adjust his opinions based on the remaining claims in this case.  Therefore, the Court finds that excluding Mr. Tierney's opinions on the ground of relevance is premature at this time.  The Court will allow Plaintiffs to raise additional objections as to the admissibility of Mr. Tierney's opinions at trial; however, at this point there is no reason to exclude his expert testimony.  Based on the foregoing, Plaintiffs' motion to exclude (Doc. 109) is **DENIED WITHOUT PREJUDICE.**

### 4. Paul Britton

Plaintiffs move to exclude certain opinions of Paul Britton pursuant to Federal Rules of Evidence 401, 403, 702, 703 and Federal Rules of Civil Procedure 26(a)(2)(B).  (Doc. 108, at 1.) The Vogtle Defendants offer Mr. Britton "to review, evaluate, and assess issues related to [Plaintiffs'] installation and construction of the electrical bus systems at Plant Vogtle." (Doc. 138, at 3.)

Mr. Britton has a Master's of Business Administration from Kennesaw State University and did substantial studies in the Master's Degree in Construction Management at Southern Polytechnic State University.  (Doc. 128-4, at 66.)  He has more than 50 years of experience in the construction industry, working as a general

contractor, electrical contractor, construction manager, and craft
contractor, and Vice President and Operations Manager of Gibson
Electric. (Id. at 65-66.) Mr. Britton also has experience working
with switch gear, NSPB ducts, installation of NSPB duct systems,
and evaluating installation work as a consultant on construction
projects that included bus duct systems. (Id. at 65.) He has
also "managed projects involving bus systems where he was in charge
of purchasing and ensuring duct equipment was delivered and
installed properly." (Doc. 138, at 7.)

Plaintiffs seek to exclude Mr. Britton's "opinions related to
the quality control measures employed by Calvert in producing the
Bus System Goods," opinions "based upon the assumption or assertion
that the [NSPB g]oods were defective," and opinions as to the
"'reasonableness' of the business decision that SNC made in
replacing all of the Bus System Goods." (Doc. 108, at 2-3.)
Plaintiffs argue that Mr. Britton is not qualified, his opinions
are not reliable, and his opinions are irrelevant. (Id.) The
Vogtle Defendants oppose the motion. (Doc. 138.)

a. *Qualifications*

First, Plaintiffs argue Mr. Britton is not qualified to opine
on the reasonableness of SNC's decision to replace all of the Bus
System Goods. (Doc. 108, at 9.) Plaintiffs contend Mr. Britton
"is not a business expert and lacks any actual expert work relevant
to this case." (Id.) In response, the Vogtle Defendants argue

Mr. Britton is qualified based on his "prior management and business experience in electrical contracting and bus duct installation, coupled with his more than 50[ ]years of experience in the construction industry." (Doc. 138, at 8.) Vogtle Defendants assert Mr. Britton "managed projects involving bus systems where he was in charge of purchasing and ensuring bus duct equipment was delivered and installed properly," and this qualifies him to testify to the reasonableness of SNC's decision to terminate Plaintiffs and "employ a new vendor to design and install the replacement bus system." (Id. at 7-8.) Based on his first-hand experience with installing bus systems and managing bus system projects, the Court finds that Mr. Britton is qualified to testify to the reasonableness of SNC's decision.

   b. *Reliability*

   Second, Plaintiffs challenge Mr. Britton's opinions as unreliable. (Doc. 108, at 7-10.) In response, the Vogtle Defendants argue Mr. Britton, a nonscientific expert, employed a reliable methodology. (Doc. 138, at 8-19.) For nonscientific testimony, "[a] district court may decide that [] expert testimony is reliable based upon personal knowledge or experience." Am. Gen. Life Ins. Co. v. Schoenthal Fam., LLC, 555 F.3d 1331, 1338 (11th Cir. 2009) (citation and quotations omitted).

   Plaintiffs argue Mr. Britton may not opine that the bus bars were "defective" because he is not an expert on epoxy applications

and coatings, has not manufactured bus bars, and is not an electrical engineer. (Doc. 108, at 8.) In response, the Vogtle Defendants contend Mr. Britton's opinions concern Plaintiffs' installation work and whether this work met industry standards and practices, and he does not opine on the cause of delamination or whether that renders the material defective. (Doc. 138, at 14.) However, the Vogtle Defendants argue it is proper for Mr. Britton to rely on an assumption that the bus bars were defective to form his opinions, and they cite multiple cases that stand for the proposition that an expert is allowed to rely on factual assumptions that are supported by the record. (Id. at 15.) But an assumption that the bus bars were defective is not merely a factual assumption that Mr. Britton can find support for in the record, but rather it is a conclusion to a central issue in the case. Nevertheless, because the record does support a factual assumption that the bus bars delaminated and cracked, Mr. Britton may rely on that assumption but not on an assumption that the bus bars were defective. See United States for the Use & Benefit of TSI Tri-State Painting, LLC v. Fed. Ins. Co., No. 2:16-CV-113, 2022 WL 135311, at *4 (S.D. Ga. Jan. 13, 2022) ("[E]xperts are permitted to offer opinions that rely on assumptions, [but] those assumptions must have some basis in the record.") (citations omitted). Plaintiffs also argue Mr. Britton's opinions relating to quality control are unreliable because the quality control

standards he applies are not in writing.  (Doc. 108, at 7.)  In
response, the Vogtle Defendants argue Plaintiffs' argument misses
the point because Mr. Britton's opinions are based on his
experience receiving and working with bus duct material and a
review of the record evidence, which shows that Plaintiffs only
conducted visual inspections of the bus bars.  (Doc. 138, at 16.)
Mr. Britton's opinions on Plaintiffs' quality control measures are
reliable, even if he did not apply a quality control standard that
is not in writing.   The Court finds that Mr. Britton based his
opinion on his several years of experience "manag[ing] projects
involving bus systems where he was in charge of purchasing and
ensuring bus duct equipment was delivered and installed properly"
and review of the record evidence.  (See id. at 7.)  To the extent
Mr. Britton seeks to assume that the bus bars were defective, Mr.
Britton is not permitted to do so because that assumption is not
supported by the record.

     Plaintiffs also challenge Mr. Britton's opinion regarding the
reasonableness of SNC's decision as unreliable.  (Doc. 108, at 9-
10.)   Specifically, Plaintiffs argue Mr. Britton's opinion on
whether the decision was reasonable from a business perspective is
unreliable because Mr. Britton did not consider additional costs
or perform any calculations of changing from aluminum to copper or
changing installers, did not perform a critical path analysis to
determine the impact the decision would have on delays, and did

not know the technical adjustments that would have to be made to switch from aluminum to copper.   (Id.)   The Vogtle Defendants argue that Mr. Britton based his opinions on his experience in the construction industry and years of managing installation projects, and Plaintiffs' arguments that Mr. Britton did not consider certain factors goes to the credibility, not admissibility of his opinions. (Doc. 138, at 18.)   The Court agrees with Defendants that Plaintiffs' arguments go to credibility because "the identification of flawed data or facts relied upon by an expert is precisely the role of cross-examination" where the expert has otherwise employed a reliable methodology.   McGarity v. FM Carriers, Inc., No. CV410-130, 2012 WL 1028593, at *7 (S.D. Ga. Mar. 26, 2012) (citing Daubert, 509 U.S. at 596).   Moreover, the Court finds that Mr. Britton employed a reliable methodology based on his personal knowledge and experience in the construction industry working on and managing bus duct installation projects and review of the record evidence to form his opinion on the reasonableness of SNC's decision.

c. *Relevancy*

Lastly, Plaintiffs argue Mr. Britton's opinions are irrelevant and confusing to the jury.   (Doc. 108, at 4-7, 10.) Specifically, Plaintiffs argue Mr. Britton's opinion regarding quality control is irrelevant because he applies an "irrelevant standard" and his opinion regarding reasonableness is irrelevant

and prejudicial because he does not have a reasonable basis for it. (Id.) Plaintiffs argue that the quality assurance program referenced in the EPC Agreement is the only standard that can be used to evaluate Plaintiffs' quality control efforts. (Id. at 5.) In response, the Vogtle Defendants argue that the only relevancy challenge is to Mr. Britton's quality control opinion, and they do not address Plaintiffs' challenge to his reasonableness opinion. (Doc. 138, at 20.) Nevertheless, the Court finds that Plaintiffs' arguments regarding the reasonableness opinion go to the credibility and not admissibility of Mr. Britton's opinions, and are therefore for the jury to determine, as discussed above. As for his quality control opinion, the Vogtle Defendants argue that the EPC Agreement is not binding on Plaintiffs because they were not a party to the contract, so their reliance on the agreement being the only standard to evaluate their quality control is misplaced. (Id.) Moreover, the Vogtle Defendants argue Mr. Britton is not opining that Plaintiffs failed to follow some quality assurance obligations, but is opining, based on his experience and record evidence, that "regardless of whatever quality control procedures [Plaintiffs were] following," Plaintiffs should have undertaken a more rigorous inspection process. (Id. at 20-21.) The Court agrees with the Vogtle Defendants that Mr. Britton is not opining on whether Plaintiffs failed to comply with quality assurance obligations but based on

his experience and review of the record, offering opinions on what quality control should have taken place. The Court finds Mr. Britton's opinion as to what quality control should have taken place is relevant and will assist the jury in determining the quality control and standards associated with the installation of electrical bus systems. Accordingly, Plaintiffs' motion to exclude Mr. Britton (Doc. 108) is **DENIED**.

## C. Defendants' Motions to Exclude

### 1. Chathan Cooke

Defendants[7] move to exclude the opinions of Dr. Chathan Cooke pursuant to Federal Rule of Evidence 702. (Doc. 111, at 1; Doc. 115, at 1.) Plaintiffs offer Dr. Cooke as a rebuttal witness to the Vogtle Defendants' experts Dr. Guyer and Dr. Kattamis. (Doc. 151, at 3.) Dr. Cooke received a Bachelor's Degree in Electrical Engineering from Rensselaer Polytechnic Institute, a Master's Degree from Massachusetts Institute of Technology ("MIT"), and a Ph.D. from MIT. (Doc. 128-9, at 12.) He has been a Principal Research Engineer at the MIT Research Laboratory for Electronics since 1979 and has experience in "insulating materials, high voltage, power and diagnostic instrumentation, electrical discharges and aging and degradation of materials." (Id. at 4.)

---

[7] WECTEC adopts and incorporates all of the Vogtle Defendants' motions to exclude. (See Doc. 115.) Therefore, the Court will refer to WECTEC and the Vogtle Defendants collectively as "Defendants" in addressing the arguments raised in these motions to exclude.

He has also served as an Electrical Engineering professor at MIT and visiting professor at Suffolk University. (Id.) He is also a senior member of the IEEE. (Id.) Dr. Cooke has published papers in the area of "gaseous/vacuum, liquids[,] and solids discharges and insulation" and "testing[,] sensing[,] and monitoring dielectrics and apparatus"." (Id. at 12.)

Plaintiffs contend Dr. Cooke "rebuts the following: 1) the issues surrounding delamination; 2) the interpretations of two [Nuclear Regulatory Commission ('NRC')] documents; and 3) that the NSPB served its intended functions." (Doc. 151, at 3.) Dr. Cooke's expert report offers opinions on the "epoxy material coatings function, its relation to official standards and guidance, and support its use in its intended bus duct application." (Doc. 128-9, at 5.) Specifically, Dr. Cooke opines that "[b]ecause the epoxy coating provides the intended mechanical and electrical functions . . . , while at the same time meeting, the professional guidance and standards from authorities such as IEEE and the NRC, these epoxy coatings employed on the busbars in the AZZ bus ducts are compliant with their intended purposes." (Id. at 11.) Dr. Cooke further opines that the IEEE does not have any requirement for coating adhesion. (Id.) Defendants move to exclude the testimony of Dr. Cooke because he is not qualified, his opinions are not reliable, and his opinions are irrelevant. (Docs. 111, 115.) Plaintiffs oppose the motion. (Doc. 151.)

a. *Qualifications*

First, Defendants argue Dr. Cooke's testimony should be excluded because he is not qualified to render opinions because he "has little-to-no experience with the product or scenario upon which he [intends] to opine." (Doc. 111, at 11.) Defendants separate Dr. Cooke's opinions into two categories and challenge his qualifications as to each category: (1) Dr. Cooke is not qualified to opine on whether the bus bars were "compliant with their intended purpose and acceptable for their designated function" because he lacks experience with "air-insulated [NSPB] system with bus bars coated with an epoxy powder resin," "has no expertise in materials science or chemical engineering, no personal knowledge of the fluidized bed process by which AZZ applied the epoxy coating to the bus bars, and no basis to challenge the opinion of a materials expert"; and (2) Dr. Cooke is not qualified to opine on whether "there is no requirement for the epoxy coating to adhere to the metal substrate under the IEEE standards" because he admits he lacks experience with IEEE standards. (Id. at 4, 10-11, 13.)

In response to Defendants' first argument, Plaintiffs contend Dr. Cooke is qualified to opine on the bus system at issue because he has extensive experience in electrical engineering, high-voltage power transfer, and insulated conductors. (Doc. 151, at 6-9.) Plaintiffs argue that he has experience with insulated bus

systems, and he should not be excluded "simply because he has not previously worked with these exact NSPB materials." (Id. at 9.) Defendants argue "Dr. Cooke's experience [is] with a completely different type of bus system with very different epoxy [and that] is not sufficient to qualify him to opine on the bus system at issue." (Doc. 157, at 4.) Defendants argue he has no specific experience or background with [NSPB] duct or epoxy insulation applied through a fluidized bed coating process. (Id. at 7.) Although the Court recognizes that Dr. Cooke has experience with insulated bus systems, as Defendants point out, his experience is limited to the SF$_6$ compressed gas system, which he testified contains epoxy different than the system at issue in the case. (Doc. 157, at 4 (citing Doc. 130-2, at 287-88,295-96).) Moreover, Dr. Cooke is not merely opining on the use of the delaminated or cracked bus bars in bus systems, but also providing opinions on whether the epoxy coating needed to adhere. (See Doc. 128-9, at 11.) His opinions on the epoxy coating itself go beyond his expertise as an electrical engineer, especially considering he has experience with epoxy different than the one at issue. Therefore, the Court finds that to the extent Dr. Cooke opines on the epoxy coating and whether it needed to adhere or was compliant, he is not qualified; however, Dr. Cooke, as an electrical engineer, is qualified to testify to the effect of using bus bars with delamination and/or cracking in electrical bus systems.

In response to Defendants second argument, Plaintiffs argue Dr. Cooke has extensive experience with the IEEE standards. (Doc. 151, at 9.) Defendants argue Dr. Cooke admitted he was not qualified to offer opinions on the IEEE and his testimony on the standard "was nothing more than a layperson observation that the words delamination and adhesion are not in the specific text." (Doc. 157, at 7.) The Court agrees with Defendants that this is not a proper subject for expert testimony, however, this is a challenge to the helpfulness of his opinion, rather than his qualifications. Nevertheless, the Court finds that Dr. Cooke's opinion on whether the IEEE includes certain words is excluded because "it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.2d at 1263. Therefore, the Court does not address whether Dr. Cooke is qualified to opine on the IEEE standards but excludes that opinion on the basis that it is not helpful to the jury.

b. *Reliability*

Second, Defendants argue Dr. Cooke's opinions are unreliable because he makes assumptions not supported by the record, his methodology is flawed, and his experiences do not provide a reliable basis for his conclusions. (Doc. 111, at 14-20.) Specifically, Defendants argue Dr. Cooke assumes that "no moisture, contaminates, or outside particles can get into the bus system." (Id. at 7.) In response, Plaintiffs argue Defendants

mischaracterize Dr. Cooke's assumption as meaning that the bus system is completely free of moisture and outside particles, when his assumption was that the bus system was designed with a forced air-cooling system that removes moisture and outside particles, which is supported by the record. (Doc. 151, at 11.) Plaintiffs argue that even assuming this is a flawed assumption, Defendants' arguments should be raised on cross-examination. (Id. at 12 (citing Jones v. Otis Elevator Co., 861 F.2d 655, 663 (11th Cir. 1988)).)

However, Defendants argue that even if the assumption is permitted, Dr. Cooke's methodology does not satisfy any of the Daubert considerations for scientific testimony, such as whether the expert's theory has been tested or subject to peer review and publication. (Doc. 111, at 18-19.) Moreover, Defendants contend that his methodology is unreliable because Dr. Cooke did not conduct any testing himself. (Id. at 19.) Plaintiffs argue that Dr. Cooke considered "the results of both electrical tests and the thermal cycling test applied to the materials [conducted by Dr. Donohoe] and analyz[ed] the documents and testimony in arriving at his conclusions." (Doc. 151, at 14.) However, Dr. Cooke admitted in his deposition that, even without Dr. Donohoe's testing, his opinions would not change. (Doc. 130-2, at 255-56.) Moreover, Dr. Cooke "failed to properly reference industry practice or to point to any industry publication that supports his theories."

43

See McGee v. Evenflo Co., No. 5:02CV259-4, 2003 WL 23350439, at *8 (M.D. Ga. Dec. 11, 2003). Therefore, the Court finds Dr. Cooke did not employ a scientific methodology in reaching his opinion. Nonetheless, the Court turns to whether Dr. Cooke employed an experience-based methodology to his opinions. Defendants argue Dr. Cooke has no experience with "air-insulated [NSPB] systems or bus bars coated with epoxy applied through a fluidized bed process." (Doc. 111, at 20.) Plaintiffs argue Dr. Cooke used his "decades of experience in electrical engineering to determine whether the [NSPB goods] met its electrical function" in considering the intended electrical and mechanical functions for the NSPB goods and by performing electrical calculations to make his determinations. (Doc. 151, at 17 (citing Doc. 128-9, at 7-9).) The limited opinion on the effect of using bus bars with delamination and/or cracked epoxy in electrical bus systems is reliable because Dr. Cooke employed an experience-based methodology where he reviewed the record evidence, applied his knowledge and decades of experience in electrical engineering, and performed electrical calculations.

c. *Relevance*

Lastly, Defendants argue Dr. Cooke's opinions are not relevant because they do not assist the trier of fact. (Doc. 111, at 20-22.) Defendants argue his opinions are not relevant or helpful because (1) they are based on an assumption that is not

44

representative of the bus system at issue in the case, (2) his opinion on whether products satisfy the specification and contract are outside the scope of what he was retained for, and (3) Dr. Cooke did not analyze degradation or cracking over time. (Id.) Plaintiffs responded that Dr. Cooke's assumption is supported by the record and Defendants' other two arguments go to weight, not admissibility, which is more appropriately challenged on cross examination.[8] (Doc. 151, at 18.) The Court agrees with Plaintiffs that Defendants' third argument that Dr. Cooke did not analyze degradation can be raised during cross-examination, along with any arguments against his assumptions; however, to the extent Plaintiffs assert Dr. Cooke may testify to the specification and contract, the Court disagrees. See Coyote Portable Storage, LLC, 2011 WL 1870593, at *4. Accordingly, the Court finds that Dr. Cooke's limited opinion on the effect of using bus bars with delamination and/or cracked epoxy in electrical bus systems is relevant because it is technical in nature and will help the jury to determine whether the bus bars with delamination and/or cracked epoxy could be used as intended in an electrical bus system. Accordingly, Defendants' motions to exclude Dr. Cooke (Docs. 111,

---

[8] Plaintiffs also raise an argument that Dr. Cooke is able to testify to the NRC guidance papers to "correct[] the mischaracterizations by the Vogtle [Defendants'] experts." (Doc. 151, at 19.) However, the Court agrees with Defendants that Dr. Cooke's testimony on whether the term "delamination" does or does not appear in the NRC papers is not proper expert testimony. (Doc. 157, at 14.)

115) are **GRANTED IN PART** as it relates to his opinions on the epoxy coating adherence and IEEE standard and **DENIED IN PART** for the remaining testimony.

  2. Javier Cruz

Defendants move to exclude certain opinions of Dr. Javier Cruz pursuant to Federal Rule of Evidence 702. (Doc. 112, at 1; Doc. 115, at 1.) Plaintiffs offer Dr. Cruz as a rebuttal witness to Defendants' expert Dr. Guyer. (Doc. 150, at 2.) Dr. Cruz is a Senior Managing Engineer, Partner, and Team Leader of the Industrial Division of the Madison Group, a polymers consulting company. (Doc. 128-10, at 7.) He has extensive experience in the fields of "plastics and thermosets, composites, curing kinetics, mechanical and analytic testing, processing, and failure analysis and prevention." (Id.) Dr. Cruz has "performed testing and investigations involving automotive and industrial coatings, sealants, and hard coats." (Id.) He has a Bachelor of Science in Chemical Engineering from the University of Puerto Rico-Mayaguez, a Master of Science in Materials Science from the University of Wisconsin-Madison, and a Ph.D. in Materials Science from the University of Wisconsin-Madison. (Id.) His Ph.D. "focused on work evaluating curing of polyester and epoxy materials and optimization of processes for curing and impregnation of thermoset resin." (Id.)

Plaintiffs contend that Dr. Cruz "specifically rebutted Dr. Guyer's opinions that delamination would cause cracking even on properly cured bus bars; that curing issues existed in the generation 2 recipe; that strong adhesion, or any adhesion, is necessary; and that this epoxy does not require advance surface preparation." (Doc. 150, at 2 (citations omitted).) Defendants move to exclude Opinions 3 through 6 from Dr. Cruz's report:

> 3. The Gen 2 was a robust process that followed an increased time and temperature program that would result in a cure profile meeting the parameters recommended by Akzo Nobel to achieve an optimal cure. Only under an abnormal condition of an excessive time span between the pre-heat cycle and the curing cycle could the temperature of the bar be reduced enough to potentially result in some amount of under curing. This was evidenced by the lack of cracking evidenced for this material.
>
> 4. Multiple sources were identified as factors that would have led to delamination or a no-bond condition at the edges of the bars. While a delamination, or non-bonded material could have contributed to the stress field that led to the cracking of under cured epoxy, there is no evidence that supports that properly cured material would crack.
>
> 5. The evidence does not support that a strong adhesion or any kind of adhesion to the aluminum bus bar is necessary in this application.
>
> 6. The evidence supports that this type/grade of epoxy material is appropriate for this application and that no advanced surface preparation procedures are necessary for the use of this product in this application.

(Doc. 112, at 11; Doc. 128-10, at 25.)

Defendants argue that Opinions 3, 4, and 6 are not proper rebuttal opinions; and Opinions 4, 5, and 6 directly contradict

his sworn testimony. (Doc. 112, at 11-14.) Defendants also argue that if the Court does not exclude Opinions 3 through 6 based on the two non-*Daubert* arguments, his opinions should still be excluded because Dr. Cooke is not qualified, Opinions 3 through 6 are not reliable, and these opinions are irrelevant. (Id. at 14-26.) Plaintiffs oppose the motion. (Doc. 137.)

a. *Non-Daubert Arguments*

First, Defendants argue Opinions 3, 4, and 6 are not proper rebuttal opinions because they go beyond the two topics Dr. Cruz said he was rebutting in his deposition. (Doc. 112, at 13.) In response, Plaintiffs argue that each of those opinions contradict or rebut the same subject matter present in Dr. Guyer's report. (Doc. 150, at 5-7 (explaining how each opinion contradicts or rebuts an opinion in Dr. Guyer's report).) "Rebuttal expert reports are proper if they contradict or rebut the subject matter of the affirmative expert report." Leaks v. Target Corp., No. CV414-106, 2015 WL 4092450, at *3 (S.D. Ga. July 6, 2015) (citation omitted). The Court agrees with Plaintiffs' characterization of the opinions and explanations on how Dr. Cruz's Opinions 3, 4 and 6 rebut the opinions of Dr. Guyer relating to curing, causation of the delamination and/or cracking, surface preparation procedures; and therefore, finds these opinions are proper rebuttal opinions.

Second, Defendants argue Opinions 4, 5, and 6 contradict Dr. Cruz's sworn testimony because he stated during his deposition

that the opinions were not his nor were they subject matters he could opine on. (Doc. 112, at 13.) Specifically, Defendants cite to Dr. Cruz's deposition alleging that he admitted epoxy delamination can be a defect; "he does not have an opinion on whether the delaminated epoxy on the Generation [2][9] bus material should be classified as defective"; "properly cured epoxy material can crack"; "delaminated epoxy can lead to cracking in some instances"; and "he does not have an opinion on whether Generation 2 bus bars that were delaminated could ultimately crack." (Doc. 112, at 13 (quoting Doc. 130-1, at 1627, 1668, 1678, 1707, 1739, 1802, 1804-05).) Defendants contend that these admissions directly contradict Opinions 4, 5, and 6. (Id.) In response, Plaintiffs argue that Defendants "cherry-pick[ed] specific lines of [deposition] testimony without accurately considering the context of the statement from the surrounding testimony." (Doc. 150, at 10.) The Court finds Defendants' argument that Dr. Cruz contradicts his opinions in his deposition are arguments that can be raised on cross examination and are not a basis to exclude his opinions at this point. See Morrow v. Allstate Indem. Co., No. 5:16-CV-137, 2020 WL 11629213, at *10 (M.D. Ga. June 1, 2020) (plaintiff's claim of inconsistent expert testimony "does not bear

---

[9] Defendants state in their motion that Dr. Cruz "does not have an opinion on whether delaminated epoxy on the Generation 1 bus material should be classified as defective" but cites to deposition testimony that refers to Generation 2. Therefore, the Court finds that this was a typographical error and replaces Generation 1 with Generation 2 in this specific sentence.

on the admissibility of the [expert opinion]"; rather, this is "an appropriate matter to explore on cross-examination.") However, as for Defendants' argument that Dr. Cruz admits he does not have an opinion on a subject matter, to the extent Dr. Cruz intends to opine on whether the delaminated epoxy on Generation 2 bus bars were defective or whether those bus bars that were delaminated could ultimately crack, these opinions are excluded because he admitted he would not be opining on those matters.

### b. *Qualifications*

In addition to the argument that Dr. Cruz admitted he was not opining on the topics covered in Opinions 4, 5, and 6, Defendants argue that Opinions 3 through 6 should be excluded because Dr. Cruz is not qualified to testify regarding epoxy coating on NSPB bars. (Doc. 112, at 15-17.) Defendants argue Dr. Cruz has no experience using epoxy resin to coat NSPB bars, using coatings in an electrical bus system, designing electrical bus systems, and investigating the failure of a bus system or the failure of a coating on a bus bar. (Id. at 15-16.) Defendants also point to Dr. Cruz admitting that whether epoxy resin applied using a fluidized bed approach should be "integrally bound" to the bus bar is beyond his expertise. (Id. at 16.) Plaintiffs argue Dr. Cruz is qualified because he is a material engineer with background and experience in the materials coating industry. (Doc. 150, at 16.) Additionally, Plaintiffs argue Dr. Cruz has experience in epoxy

coating aluminum substrates.  (Id. at 15.)  Based upon Dr. Cruz's deposition testimony in which he admits whether epoxy should be bound is beyond his expertise, the Court finds Dr. Cruz is not qualified to provide Opinions 4 through 6 because they directly relate to epoxy coating on bus bars, which he admittedly lacks experience in.  However, Dr. Cruz is qualified to give Opinion 3 as it relates to the curing of epoxy coating, in which he generally has experience.

### c. *Reliability and Relevancy*

Second, Defendants argue Dr. Cruz's Opinions 3 through 6 are unreliable and irrelevant because he did not review or analyze sufficient facts and data regarding the bus bars.  (Doc. 112, at 8-9, 17-22.)  Because Opinions 4 through 6 are excluded based on the analysis above, the Court will only address whether Opinion 3 is reliable and relevant.  Defendants argue Dr. Cruz did not physically inspect any of the bus bars, did not review any of the AZZ epoxy inspection sheets or summary of those inspections, and did not review any internal correspondence related to the cracking found on Generation 2 bus bars.  (Id. at 8-9, 18-19.)  Defendants contend Dr. Cruz admitted that he did not rely on AZZ documents that showed the Generation 2 material was cracking to form his opinions.  (Id. at 8-9.)  In response, Plaintiffs argue Dr. Cruz's opinion "that the Generation 2 fluidized bed coating represents a robust process that achieved the optimal level of cure identified

by Akzo Nobel" is based on analyzing the reports provided by Akzo Nobel and comparing it to AZZ's Generation 2 recipe and that Dr. Cruz's analysis "represents a generally accepted methodology of the scientific community." (Doc. 150, at 19.) However, Plaintiffs do not provide any support or additional arguments for their contention that analyzing the reports provided by the manufacturer of the epoxy material is a generally accepted methodology. Therefore, the Court finds that Plaintiffs have failed to show that Dr. Cruz employed a reliable scientific or experience-based methodology and therefore, Opinion 3 is unreliable. Moreover, Opinion 3 is irrelevant because Dr. Cruz's assumption that there was no cracking in the bus bars is not supported by the record. Accordingly, Defendants' motions to exclude Dr. Cruz (Docs. 112, 115) are **GRANTED.**

### 3. Steven Hoisington[10]

Defendants move to exclude the opinions of Mr. Steven Hoisington pursuant to Federal Rule of Evidence 702. (Doc. 114, at 1; Doc. 115, at 1.)    Plaintiffs offer Mr. Hoisington as a

---

[10] The Parties indicated that Mr. Hoisington's expert report would be submitted in a joint appendix list of exhibits relied on in the dispositive and Daubert motions in accordance with the February 3, 2022 Scheduling Order. (Doc. 114, at 2 n.1; Doc. 152, at 2 n.1.)  Defendants refer to Mr. Hoisington's expert report as Exhibit A, and Plaintiffs refer to it as Deposition Exhibit 389. (Id.)  However, upon reviewing the joint appendix submitted by the Parties, the Court notes that Exhibit A/Deposition Exhibit 389 is a page with handwritten calculations - not Mr. Hoisington's expert report. (Doc. 127; Doc. 128-9, at 60-62.)   Nonetheless, this error by the Parties does not impact the Court's Daubert analysis because Plaintiffs properly disclosed the expert report to Defendants and both Parties rely on Mr. Hoisington's deposition testimony and include all relevant portions of the expert report in their briefings.

rebuttal witness to Defendants' experts Dr. Guyer, Dr. Kattamis, and Mr. Britton's opinions "that AZZ's quality control program was lacking and deficient." (Doc. 152, at 2.)  Mr. Hoisington is a consultant with experience in quality management and an undergraduate degree in industrial engineering technology. (Doc. 181-8, at 916-17.)  He has professional affiliation with the Institute of Industrial Engineers and the American Society for Quality. (Id.)  According to Plaintiffs, Mr. Hoisington is "a certified quality manager with over 35 years of experience as a quality control professional" and "has extensive experience in supervising, implementing, and assessing quality management systems." (Doc. 152, at 3.)

Mr. Hoisington's expert report offers opinions on "whether AZZ's Quality Management system from 2011-2015 was reasonable and sufficient." (Id.)  Mr. Hoisington's report also "focuses on AZZ's ISO 9001 certification,[11] customer accolades regarding other projects, and general awards, trophies and certificates displayed at AZZ's headquarters." (Doc. 114, at 2.)

Defendants argue Mr. Hoisington is not qualified to give opinions outside of quality control from 2013 to 2015, and his opinions of quality control from 2013 to 2015 are not reliable or

---

[11] Mr. Hoisington explained in his deposition that "ISO 9000 is a voluntary registration process" and having an ISO 9000 certification shows "they started at least a commitment to a formal quality process." (Doc. 181-8, at 1002-03.)

relevant.  (Docs. 114, 115.)  Plaintiffs oppose the motion.  (Doc. 152.)

a. *Qualifications*

First, Defendants argue Mr. Hoisington is not qualified to opine on subject matter unrelated to quality control because he testified in his deposition that "his opinions are limited only to the quality control program in place related to manufacturing the [NSPB] bars from 2013 to 2015." (Doc. 114, at 8.)  However, according to Defendants, Mr. Hoisington's expert report contains opinions on "(i) contractual requirements, (ii) the purchase order warranties, (iii) alleged acceptance of AZZ's product, and (iv) what constitutes a defect or appropriate repair." (Id. at 8-9.) Defendants do not dispute that Mr. Hoisington is qualified to opine on quality control, but argue these additional opinions go far beyond quality control. (Doc. 160, at 2-3.)  Plaintiffs argue Mr. Hoisington is qualified to opine on quality control from 2011 to 2015.  (Doc. 152, at 4.)  In response to Defendants' arguments that Mr. Hoisington's opinions go beyond the scope of quality control, Plaintiffs argue Mr. Hoisington is qualified to opine on (1) contractual requirements because they are "provisions pertaining to quality control"; (2) purchase order warranties and acceptance because "it is clear that quality control, acceptance, and warranties, are intertwined, as the warranty period begins to run upon acceptance"; and (3) what constitutes a defect or

appropriate repair because these "concepts are certainly bound up in the theme of quality control." (Id. at 5-6.) Defendants argue Mr. Hoisington is not qualified to provide these non-quality control opinions because he has no experience in bus systems, warranty or contractual obligations, or epoxy coatings. (Doc. 160, at 3.) Moreover, Defendants argue that just because Mr. Hoisington reviewed IEEE standards as part of his quality control review "does not give him the basis and expertise to interpret them to opine whether delamination is a defect." (Id. at 6.)

Plaintiffs' argument regarding Mr. Hoisington's quality control opinion is unavailing because they provide no explanation for why the Court should disregard Mr. Hoisington's deposition testimony that his opinions are limited to the 2013 to 2015 time period. As for the non-quality control opinions, the Court finds Mr. Hoisington is not qualified to provide these additional opinions. Not only has Mr. Hoisington testified that he has no experience relevant to these opinions, the Court agrees with Defendants that they go far beyond his area of expertise in quality control. Therefore, Mr. Hoisington is only qualified to opine on the quality control program in place related to manufacturing the NSPB bars during the 2013 to 2015 time period, and his non-quality control opinions are excluded as they are outside of Mr. Hoisington's expertise.

b. *Reliability*

Second, Defendants argue Mr. Hoisington's quality control opinions for the 2013 to 2015 time period are not reliable. (Doc. 114, at 10-14.) Defendants argue that "he did not review or analyze relevant facts and data regarding this time period." (Id. at 10.) According to Defendants, Mr. Hoisington "relied entirely on his site visits in 2021 and his review of documents from the 2021 time period[,]" but he "did nothing to verify whether what he observed in 2021 was in place during 2013-2015" other than through limited conversations with Derrick Henderson and Kathy McCullar. (Id. at 10-11.) Moreover, Defendants argue "Mr. Hoisington has not identified a methodology he used to generate his opinions[,]" "has not explained how his experience in quality control is a sufficient basis for his opinion[,]" and "has not explained how his experience with the Malcolm [Baldrige] Award and ISO 9000 provides a sufficient basis for his methodology." (Id. at 12-13.) Ultimately, Defendants argue that his "experience and observations at the site eight years after the relevant time period are not a sufficient methodology on which to base his opinions." (Id. at 13.) In response, Plaintiffs argue Mr. Hoisington used his experience in quality control to form his opinions. (Doc. 152, at 9-11.) Plaintiffs contend Mr. Hoisington's opinions are reliable because he explained in his deposition that the investigation in 2021 showed AZZ had a robust quality control program during 2013-

2015 based on "[q]uality culture."   (Id. at 9.)  Plaintiffs also
argue that Mr. Hoisington reviewed the certificates of compliance
created by Shaw, used the Malcom Baldridge criteria in analyzing
Plaintiffs' quality control program, and spoke with McCullar and
Henderson who had knowledge of the quality control standards from
2013-2015. (Id. at 9-10.)  Plaintiffs contend that the arguments
raised by Defendants go to the credibility and weight of his
opinions, not admissibility.  (Id. at 10-11.)  The Court agrees
with Plaintiff that Defendants' arguments go to Mr. Hoisington's
credibility, and because it has already found he is qualified to
opine on quality control, his offered opinions based on his
experience-based methodology are reliable and any issues of
credibility can be determined by the jury at trial.

c. *Relevancy*

Lastly, Defendants argue Mr. Hoisington's quality control
opinions are irrelevant because they "do not contend AZZ breached
the quality control provisions in the relevant contracts" by
failing to be ISO 9001 certified or not having an approved quality
control program. (Doc. 114, at 14.) Defendants contend that "the
one quality control-related issue raised by the [Vogtle
Defendants] and addressed by Dr. Guyer is related to the undisputed
fact that AZZ knew it had epoxy delamination and cracking on its
bus bars early in the manufacturing process, but did nothing other
than visual inspections."   (Id.)  Defendants argue that Mr.

Hoisington's opinion could mislead the jury to think that because there was a quality control system in place that the bus bars with delaminated and epoxy coating were compliant. (Id. at 15.) Defendants also argue that his testimony regarding customer accolades, awards, or trophies is not the proper subject of expert testimony and constitutes impermissible character evidence because it does not help the jury understand something specialized or technical. (Id. at 16-17.) In response, Plaintiffs argue that the testimony is relevant because it directly rebuts the Vogtle Defendants' experts' criticism of AZZ's quality control program and goes to the issue of duty and breach. (Doc. 152, at 12-13.) Plaintiffs contend Mr. Hoisington's explanation of the ISO 9000 certification would help a jury understand the meaning and significance of such certification. (Id. at 8.) Plaintiffs also argue "Mr. Hoisington's testimony and opinions as to AZZ's product being compliant with the purchase orders and specifications in light of their quality control program" goes to a central issue in the case. (Id. at 14.) The Court finds Mr. Hoisington's opinion on the quality control from 2013-2015 and explaining the ISO 9000 certification to rebut the Vogtle Defendants' opinions on AZZ's quality control is relevant because they can assist the jury in understanding the robustness of Plaintiffs quality control. However, his testimony that Plaintiffs received customer accolades, awards or trophies are not helpful because these

opinions are not technical, and therefore are not the proper basis for expert testimony. Accordingly, Defendants' motions to exclude Mr. Hoisington (Docs. 114, 115) are **GRANTED IN PART** as to his non-quality control opinions and testimony that merely state that Plaintiffs have received customer accolades, awards or trophies and **DENIED IN PART** as to his quality control opinions for the 2013-2015 time period.

### 4. Patrick Donohoe

Defendants move to exclude the opinions of Dr. Patrick Donohoe pursuant to Federal Rule of Evidence 702. (Doc. 113, at 1; Doc. 115, at 1.) Plaintiffs offer Dr. Donohoe as a rebuttal witness to provide opinions "that the AZZ bus bar system, as designed, would operate normally." (Doc. 153, at 2.)

Dr. Donohoe has a Bachelor of Science from Mississippi State University, a Master of Science in Electrical Engineering from Mississippi State University, and a Ph.D. in Electrical Engineering from the University of Mississippi. (Doc. 128-6, at 94.) He was a professor in the Department of Electrical and Computer Engineering at Mississippi State University from 1986 to 2021. (Id.) Dr. Donohoe is a Senior Member of the IEEE and currently serves as Secretary on the Region 3 Executive Committee. (Id.) He is currently active with the National Council of Examiners for Engineering and Surveying as the chair of the Electrical and Computer Engineering Exam Committee. (Id.)

Dr. Donohoe's expert report offers opinions that: "1) a bus bar system with delaminated epoxy and no cracks is an effective insulation barrier; 2) a bus bar system with epoxy cracks covered by a boot where the boot is extended the same length as the crack would have the same effectiveness as epoxy with no cracks; and 3) based upon the thermal cycling test, the test bars did not further degrade or incur new anomalies." (Doc. 153, at 5.)  According to Plaintiffs, Dr. Donohoe rebuts the opinions of Dr. Guyer and Dr. Kattamis, but Defendants disagree and argue that Dr. Donohoe is an improper rebuttal expert.  (Id.; Doc. 113, at 3.)

Defendants move to exclude the opinions of Dr. Donohoe because he is an improper rebuttal expert and his opinions are unreliable and irrelevant, but they do not challenge his qualifications. (Doc. 113, at 3; Doc. 115.)  Plaintiffs oppose this motion.  (Doc. 153.)[12]

a. *Rebuttal Expert*

First, Defendants argue Dr. Donohoe is not a proper rebuttal expert because he admitted during his deposition that he is not rebutting any of the Vogtle Defendants' expert witnesses.  (Doc. 113, at 13 (citing Doc. 130-2, at 499-500).)  In fact, he testified that he did not rebut the Vogtle Defendants' experts in his report.

---

[12] Plaintiffs filed a response to the Vogtle Defendants' motions to exclude (Doc. 149) and an amended response to the Vogtle Defendants' motions to exclude (Doc. 153) with no objections.  The Court, therefore, will only consider Plaintiffs' amended response for their arguments.

(Id.) Defendants contend Dr. Donohoe's opinions are affirmative expert opinions that should have been disclosed prior to the affirmative expert deadline because they promote AZZ's case-in-chief "that the bus bars AZZ provided and installed at Plant Vogtle were not defective and therefore AZZ's invoices for such work should have been paid." (Id.) Defendants argue that Plaintiffs' failure to disclose Dr. Donohoe as an affirmative expert is not substantially justified or harmless. (Id. at 14.) In response, Plaintiffs argue that Dr. Donohoe's report rebuts Dr. Guyer's opinion "that delamination can lead to cracking of the epoxy over time" and rebuts Dr. Kattamis' opinion that "delamination and cracking of epoxy coating on the bus bars rendered them and the bus system defective." (Doc. 153, at 9.) Plaintiffs argue that even though Dr. Donohoe stated that he was not rebutting these experts, the reports clearly rebut Dr. Guyer and Dr. Kattamis. (Id.) Plaintiffs also contend that Dr. Donohoe's opinions do not relate to their case-in-chief because their claims are for payment of installation work and do not involve the Purchase Orders that cover the manufacturing of the bus bars. (Id. at 3.) Moreover, Plaintiffs argue that even if Dr. Donohoe is not a proper rebuttal expert, their failure to timely provide his report is substantially justified and the Vogtle Defendants have suffered no harm. (Id. at 4.) Plaintiffs argue they could not have produced Dr. Donohoe's report earlier because "it could not predict the contents of Dr.

Guyer's and Dr. Kattamis' report," and the Vogtle Defendants suffered no harm because they had adequate time to prepare and depose Dr. Donohoe. (Id. at 10-11.) Defendants argue that the tests Dr. Donohoe applied do not rebut the issues Plaintiffs claim he is rebutting. (Doc. 159, at 12-13.) According to Defendants, Plaintiffs "never took the position that delamination and/or cracking are acceptable characteristics of the bus bars at any point since 2013" and a "change in strategy at this late stage of litigation does not excuse their late disclosure." (Id. at 13-14.)

"Rebuttal expert reports necessitate a showing of facts supporting the opposite conclusion of those at which the opposing party's expert arrived in their responsive reports." Leaks, 2015 WL 4092450, at *3 (citation omitted). "Rebuttal expert reports are proper if they contradict or rebut the subject matter of the affirmative expert report." Id. "A sign that a report rebuts an opposing report is whether it addresses the 'factual underpinnings' of the opposing report." Reese v. CSX Transp., Inc., No. CV 118-215, 2020 WL 5740253, at *13 (S.D. Ga. Sept. 24, 2020) (citation omitted). However, a report is not a rebuttal if it raises new arguments that solely expand the party's case-in-chief. ITT Corp. v. Xylem Grp., LLC, No. 1:11-cv-3669, 2012 WL 12871632, at *4 (N.D. Ga. Oct. 15, 2012). Ultimately, the Court

has the discretion in determining if an expert report is a proper rebuttal report.  Reese, 2020 WL 5740253, at *13.

The Court is concerned with Dr. Donohoe's testimony that he is not rebutting the Vogtle Defendants' opinions but cannot identify binding authority to exclude an expert's opinion entirely on this basis.  Therefore, the Court looks to the actual opinions Dr. Donohoe offers to see if they rebut the opinions of Dr. Guyer and Dr. Kattamis and whether Dr. Donohoe's opinions promote Plaintiffs' case-in-chief.  First, the Court finds Dr. Donohoe's opinion that delaminated or cracked epoxy coating would not experience accelerated degradation over time rebuts Dr. Guyer's opinion that delamination can lead to cracking of epoxy over time. Further, Dr. Donohoe's opinion that delaminated epoxy with no cracks is an effective insulation barrier rebuts Dr. Kattamis' opinion that delamination renders the bus system defective. Second, the Court finds that Dr. Donohoe's opinions do not promote Plaintiffs' case-in-chief.  The Court notes Plaintiffs' position, although dispute by Defendants, that nonpayment claims relate to the installation work and not the manufacturing of the bus bars shows that Plaintiffs did not find it necessary to prove the condition of the bus bars through expert testimony to prevail on their claims.  Therefore, the Court finds Dr. Donohoe is a proper rebuttal expert.  Moreover, the challenges Defendants make against

the testing methods employed by Dr. Donohoe go to reliability, not to whether Dr. Donohoe is a proper rebuttal expert.

b. *Reliability*

Second, Defendants argue that if Dr. Donohoe is admitted as a proper rebuttal expert, then his opinions should be excluded because they are unreliable. (Doc. 113, at 15-20.) Defendants argue his opinions are not based on reliable methodology because he tested bus bars that were not representative of the bus bars at issue and the tests are not generally accepted in the scientific community to test epoxy adhere or to test bus bars with delaminated and/or cracked epoxy. (Id. at 15-19.) In response to Defendants' first argument, Plaintiffs admit Dr. Donohoe did not know whether the bus bars were representative but submit the affidavit of fact witness Mark Roberson to show that the bus bars tested were the same ones manufactured for Plant Vogtle. (Doc. 153, at 14-15; Doc. 153-1.) Defendants argue Plaintiffs do not cite any legal authority that provides an affidavit from a fact witness and not the expert himself can be used to clarify incorrect or incomplete testimony, but even if the Court were to consider Mr. Roberson's affidavit, it does not fix the reliability issues of Dr. Donohoe's opinions for two reasons. (Doc. 159, at 5-6.) Defendants argue that Mr. Roberson's affidavit does not explain whether the delamination and/or cracking on the tested bus bars were created for the purpose of testing or whether they were a result of

64

Plaintiffs' manufacturing process and does not cure the fact that none of the bus bars tested had cracks extending beyond the rubber booted area. (Id. at 5.)

As Defendants point out, without any binding authority permitting an expert witness's opinion and report to be corrected with a fact witness's affidavit, the Court is unconvinced that Mr. Roberson's affidavit can correct the reliability issues with Dr. Donohoe's opinions. Furthermore, even if the Court were to consider Mr. Roberson's affidavit, the Court finds his affidavit still fails to show that the bus bars tested by Dr. Donohoe were representative of the bus bars at issue because Mr. Roberson's affidavit does not explain how the delamination and/or cracking was created and why it did not extend past the rubber booted area. Because the Court finds Dr. Donohoe's opinions unreliable on this basis, it does not address whether the tests conducted are generally accepted by the scientific community and whether these opinions are relevant. Accordingly, Defendants' motions to exclude Dr. Donohoe (Docs. 113, 115) are **GRANTED** because his opinions are unreliable.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are

"material" if they could affect the outcome of the suit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor."  United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation and internal quotation marks omitted).  The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case, or by showing that there is no evidence to prove a fact necessary to the non-movant's case.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex, 477 U.S. 317).  Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there

are no genuine issues of material fact and that it is entitled to judgment as a matter of law. <u>Jones v. City of Columbus</u>, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam).  A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. <u>Clark</u>, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." <u>Id.</u>  When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. <u>Id.</u>  If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." <u>Fitzpatrick</u>, 2 F.3d at 1116.  If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1116-17 (citation omitted).  The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. <u>See</u> <u>Morris v. Ross</u>, 663 F.2d 1032, 1033-34 (11th Cir. 1981).  Rather, the non-movant must

respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The Local Rules require the movant to include a statement of undisputed material facts with its motion. See L.R. 56.1, SDGa. "Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions." Preis v. Lexington Ins. Co., 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007). Essentially, the Court has no duty "to distill every potential argument that could be made based upon the materials before it on summary judgment." Id. (citing Resol. Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)). Accordingly, the Court will only review the materials the Parties have specifically cited and legal arguments they have expressly advanced. See id.

In this action, the Clerk of Court provided all Parties notice of the motions for summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default. (Docs. 110, 124, 125.) For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985), have been satisfied. The time for filing materials in opposition has expired, the issues have been thoroughly briefed, and the motions are now ripe for consideration.

## IV. DISCUSSION

Plaintiffs move for summary judgment on all of their claims that were transferred to this Court and all of the Vogtle Defendants' counterclaims. (Doc. 104.) Both the Vogtle Defendants and WECTEC move for summary judgment on Plaintiffs' breach of IAA claim (Count V) and partial summary judgment on the Vogtle Defendants' breach of contract counterclaims (Count I, II, III, VII, VIII) and negligent construction counterclaim (Count IV).[13] (Docs. 116, 119.) The Court addresses each of the claims below, starting with Plaintiffs' claims.

As an initial matter, there is no dispute as to what state law applies to the relevant contracts. Therefore, the Court will apply the following law when analyzing the claims under the contracts: (1) Purchase Orders are governed by North Carolina law (Doc. 105, at 26; Doc. 122, at 30)[14]; (2) IAA is governed by New York law (Doc. 139, at 28; Doc. 122, at 23)[15]; (3) Vogtle

---

[13] WECTEC's motion for summary judgment and motion for partial summary judgment adopt the entirety of the Vogtle Defendants motions and brief. (See Doc. 119, at 1; Doc. 126, at 1.) However, the Court notes that WECTEC is not a party to any of the Counts for which the Vogtle Defendants seek summary judgment or partial summary judgment: Plaintiffs' Count V is brought against the Vogtle Defendants, the Vogtle Defendants' Counts I, II, III, IV, VII, and VIII are brought against Plaintiffs. (See Doc. 8-3, at 22-23; Doc. 8-5, at 43-48; Doc. 68, at 10-12.) Because WECTEC's motions for summary judgment and partial summary judgment seek judgment on claims that it is not a party to, the motions (Doc. 119) are **DENIED AS MOOT.**

[14] There is a dispute as to whether the Uniform Commercial Code ("UCC") adopted by North Carolina is binding on the contract, which the Court addresses in Section B.3.b. (See Doc. 105, at 26; Doc. 146, at 15-16; Doc. 161, at 5-7.)

[15] Plaintiffs, in their motion for summary judgment, applied Georgia law to the IAA, but in their response to the Vogtle Defendants' motion for summary judgment, they apply New York law to the IAA. (Doc. 105, at 21; Doc. 139, at

Subcontract is governed by Georgia law (Doc. 105, at 45; Doc. 122, at 31); and (4) Bridge Agreement is governed by Georgia law (Doc. 122, at 31).[16]

## A. Plaintiffs' Claims

### 1. Declaratory Judgment (Count I)

Plaintiffs seek declaratory judgment that Invoice 7521, relating to work done under the Vogtle Subcontract, is an allowable administrative expense of the Westinghouse/WECTEC bankruptcy estate. (Doc. 105, at 19-20.) Plaintiffs argue Invoice 7521 qualifies as an administrative expense because the work "benefited and helped preserve the assets of the estate, lessen[ed] contractual liability WECTEC and parent Westinghouse may have to Owners for leaving the project incomplete, and helped preserve the value of an asset of the estate."[17] (Id. at 19.) Defendants argue that Plaintiffs' claim does not qualify as an administrative expense because Invoice 7521 does not arise from a post-petition

_____

28.) Therefore, the Court finds there is no dispute that New York law applies to the IAA.

[16] Plaintiffs do not explicitly concede that the Bridge Agreement is governed by Georgia law but acknowledges that the Bridge Agreement incorporates the Vogtle Subcontract and raises the same arguments in addressing the Bridge Agreement claims. (Doc. 105, at 52-54.) Therefore, the Court finds no dispute that Georgia law governs the Bridge Agreement.

[17] Plaintiffs also argue declaratory judgment that Invoice 7521 is an administrative expense is proper because the "opposing parties have a substantial controversy." (Id. at 20.) However, this argument goes to whether declaratory judgment is proper, not whether Invoice 7521 qualifies as an administrative expense. Therefore, the Court must first determine whether Invoice 7521 qualifies as an administrative expense to determine whether declaratory judgment should be granted in Plaintiffs' favor.

transaction with the Debtors and the services Plaintiffs provided did not benefit the Debtors' estates.[18]   (Doc. 148, at 3-6.)

To determine whether a claim qualifies as an administrative expense under 11 U.S.C. § 503(b), courts generally apply a two-prong test: "(1) the expense must have arisen from a post-petition transaction between the creditor and the debtor, and (2) the expense must have been 'actual and necessary' to preserve the estate."  In re Jarriel, 518 B.R. 140, 146 (Bankr. S.D. Ga. 2014) (citations and quotations omitted).  To show that the expense was "actual and necessary", "[t]here must be an actual, concrete benefit to the estate . . . ."  In re Brooks, No. 13-10860, 2016 WL 1376354, at *4 (Bankr. S.D. Ga. Mar. 31, 2016) (quoting In re Subscription Television of Greater Atlanta, 789 F.2d 1530, 1532 (11th Cir. 1986)) (quotations omitted).  Plaintiffs bear the burden at trial to prove by a preponderance of the evidence that Invoice 7521 should be declared an administrative expense.  Id.  The Court will address each prong of the two-prong test to determine whether it qualifies as an administrative expense.

---

[18] As to Plaintiffs' Count I, the Vogtle Defendants incorporates WECTEC's arguments in their brief.  (Doc. 146, at 4.)  Additionally, the Court notes that under the Stipulation, the Owners agreed to defend and indemnify WECTEC against Plaintiffs' claims related to the Vogtle Project asserted against WECTEC.  Accordingly, the Court will once again refer to the Vogtle Defendants and WECTEC collectively as "Defendants" in addressing Plaintiffs' Count I, even though Count I is against WECTEC.

a. *Invoice 7521 Does Not Arise From a Post-Petition Transaction Between Plaintiffs and Debtors*

First, Plaintiffs' work for Invoice 7521 undisputedly occurred post-petition; however, Defendants argue that this post-petition work arose from the pre-petition Vogtle Subcontract between WECTEC and Plaintiffs "as opposed to under any separate post[-]petition transaction with the Debtors' estates." (Doc. 148, at 3.) Plaintiffs argue that work arose from a post-petition transaction between it and Debtor's estate because WECTEC induced them to do the post-petition work with the IAA and that WECTEC "moved the bankruptcy court to approve the [IAA] arrangement to keep the Project moving forward." (Doc. 105, at 19-20.) Plaintiffs argue that the "real focus of the test" is "the debtor whose actions create[d] the inducement." (Doc. 166, at 3.) However, unlike other circuit courts, the Eleventh Circuit has not addressed whether inducement by a debtor to perform is sufficient to find there was a post-petition transaction. See, e.g., Matter of Whistler Energy II, L.L.C., 931 F.3d 432, 443 (5th Cir. 2019) (holding that "a creditor can establish that its expenses are attributable to the actions of the bankruptcy estate through evidence of either a direct request from the debtor-in-possession or other inducement via the knowing and voluntary post-petition acceptance of desired goods or services.") (citation omitted); see also In re Mammoth Mart, Inc., 536 F.2d 950, 955 (1st Cir. 1976)

(explaining that "[w]hen the debtor-in-possession . . . accepts services from a third party without paying for them, the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority."). Accordingly, the Court does not consider the arguments relating to inducement to determine whether there was a post-petition transaction between Plaintiffs and Debtors.[19] Therefore, Plaintiffs have failed to show how Invoice 7521 meets the first prong required to qualify as an administrative expense.

### b. *Plaintiffs' Work Did Not Benefit Debtors' Estate*

Assuming *arguendo* that Plaintiffs satisfied the first prong under 11 U.S.C. § 503(b), Plaintiffs must also demonstrate the expense was "'actual and necessary' to preserve the estate." In re Jarriel, 518 B.R. at 146 (citations omitted). As set forth above, an "actual and necessary" expense requires "an actual, concrete benefit to the estate . . . ." In re Brooks, 2016 WL 1376354, at *4 (citations and quotations omitted). This means

---

[19] Even if the Court were to consider Plaintiffs' arguments, Plaintiffs still fail to show the Debtors induced them under the IAA to perform the work. Plaintiffs contend they were induced to work by WECTEC entering into the IAA. (Doc. 105, at 19; Doc. 166, at 2-3.) Defendants argue there was no inducement because Plaintiffs' reliance on the testimony of Thomas Saunders, an employee of SNC, to argue the purpose of the IAA is misplaced. (Doc. 148, at 4.) Defendants contend that Mr. Saunders is not even an employee of WECTEC, and importantly, his testimony only goes to the Owners' "motivation in entering into the [IAA], not to any inducement by the Debtors that might rise to the level of a post[-]petition transaction with [Plaintiffs.]" (Id.) The Court agrees because the testimony of SNC's employee does not provide evidence that there was any transaction between Plaintiffs and Debtors. Moreover, to the extent that Plaintiffs also argue they are third-party beneficiaries to the IAA and therefore were induced to perform, the Court finds that Plaintiffs are not third-party beneficiaries for the reasons discussed in Section A.2.

that Plaintiffs must show that the transaction "directly and substantially benefitted the estate." <u>In re Durango Ga. Paper Co.</u>, No. 02-21669, 2021 WL 1259530, at *6 (Bankr. S.D. Ga. Mar. 31, 2021) (citation and quotations omitted). The mere potential of benefit is insufficient. <u>In re Subscription Television of Greater Atlanta</u>, 789 F.2d at 1532 ("That which is thought to have some potential benefit . . . is too speculative to be allowed as an 'actual, necessary cost and expense of preserving the estate.'" (citations omitted).)

Here, Plaintiffs argue the work it completed benefited WECTEC by preserving the assets of the estate and lessening the contractual liability WECTEC may have for leaving the Vogtle Project incomplete.[20] (Doc. 105, at 19.) In response, Defendants argue that most of the work done under Invoice 7521 involved the installation of the structural steel, and at a minimum, there is a material dispute as to whether the installation was defective. (Doc. 148, at 5-6.) Moreover, Defendants argue that prior to July 2017, WECTEC had moved to reject the EPC Agreement and indicated it "no longer had responsibility for constructing Units 3 and 4, including the electrical bus system" so "[a]ny non-defective

---

[20] Plaintiffs also contend WECTEC is judicially estopped from denying any benefit because the bankruptcy court noted that the IAA was "in the best interests of Debtors, their estates, creditors, and all parties in interest." (Doc. 105, at 19-20 (citing Doc. 128-3, at 11).) However, the Court agrees with Defendants that the IAA was beneficial to WECTEC because the Owners provided funding to WECTEC, so it not inconsistent to find that Plaintiffs' post-petition work did not benefit WECTEC.

installation work benefited the Vogtle Owners, not [WECTEC]." (<u>Id.</u> at 6.)   Plaintiffs   contend   that   the   transition   of   the responsibility was not effective until after a majority of the work under Invoice 7521 was completed. (Doc. 166, at 5.) However, even if this is true, Plaintiffs fail to meet their burden of showing that there was no defect in the installation of the structural steel and entitling them to payment under Invoice 7521. Therefore, the Court finds that Plaintiffs have failed to show the work done under Invoice 7521 provided a benefit to WECTEC.

For the foregoing reasons, Plaintiffs' motion for summary judgment on Plaintiffs' Count I (Doc. 104) is **DENIED**, and Plaintiffs may not obtain a declaration that Invoice 7521 was an administrative expense claim.

2. <u>Breach of the IAA (Count V)</u>

Plaintiffs and the Vogtle Defendants move for summary judgment regarding this Count V, which is based on the Vogtle Defendants' failure to pay an invoice submitted under the Vogtle Subcontract during the IAA time period. (Doc. 105, at 21-22; Doc. 122, at 26-28.)   The Vogtle Defendants argue Plaintiffs have no standing to enforce the IAA because they are neither parties nor third-party beneficiaries to the agreement under New York law. (Doc. 146, at 5; Doc. 122, at 26-28.)   Plaintiffs do not assert they are parties to the IAA, but instead they argue they are third-party beneficiaries. (Doc. 105, at 21-22; Doc. 139 at 30-32.)

Under New York law, only parties to a contract and third-party beneficiaries have standing to bring breach of contract claims. Parker & Waichman v. Napoli, 29 A.D.3d 396, 398-99 (N.Y. App. Div. 2006). "[A] third-party asserting rights under a contract must allege that: (1) a valid contract existed, (2) it was intended for the third party's benefit, and (3) that the benefit was immediate, not incidental." Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 418 (S.D.N.Y. 2010) (citing Madeira v. Affordable Hous. Found., Inc., 469 F.3d 219, 251-52 (2d Cir. 2006)). "In determining whether there is an intended third[-]party beneficiary, courts should look first at the contractual language itself . . . and where appropriate 'the surrounding circumstances.'" Muhlrad v. Mitchell, No. 96 Civ. 3568, 1997 WL 182614, at *6 (S.D.N.Y. Apr. 14, 1997) (quoting Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 573 (2d Cir. 1991)) (internal citation omitted). "While the third-party beneficiary does not have to establish that it is explicitly mentioned in the contract, New York law requires that the parties' intent to benefit a third-party be shown on the face of the contract." Synovus Bank of Tampa Bay v. Valley Nat'l Bank, 487 F. Supp. 2d 360, 368 (S.D.N.Y. 2007).

Here, as Defendants point out, the IAA includes a negating clause that explicitly provides "[n]o term of this Agreement is intended to benefit any person other than the signatories hereto

nor will any term be enforceable by any other person." (Doc. 122, at 27 (citing Doc. 128-3, at 24).) "[C]ourts applying New York law have consistently found that, even where a contract expressly sets forth obligations to specific individuals or categories of individuals, those individuals do not have standing to enforce those obligations by suing as third-party beneficiaries when the contract contains a negating clause." In re Lehman Bros. Holdings Inc., 479 B.R. 268, 275-76 (S.D.N.Y. 2012), aff'd, 513 F. App'x 75 (2d Cir. 2013). Even if the Court finds that "subcontractors" in the IAA is a reference to Plaintiffs, this is not enough to make Plaintiffs third-party beneficiaries because the IAA has a negating clause. As a result, Plaintiffs do not have standing to bring this claim; therefore, Plaintiffs' motion for summary judgment on Plaintiffs' Count V (Doc. 104) is **DENIED** and Defendants' motion for summary judgment on Plaintiffs' Count V (Doc. 116) is **GRANTED.** Accordingly, Plaintiffs' Count V is dismissed.[21]

### 3. Breach of Contract for Failure to Pay Invoices (Counts II and VI)

Plaintiffs move for summary judgment on Count II, which is based on WECTEC's failure to pay Invoice 7521 under the Vogtle Subcontract, and Count VI, which is based on the Vogtle Defendants' failure to pay Invoices 7581, 7582, 7615, 7630, 7631, 7661, and

---

[21] Because the Court dismisses Plaintiffs' Count V based on lack of standing, the Court does not need to address whether there was a breach of the IAA.

7713 (collectively, the "Bridge Agreement Invoices") under the Bridge Agreement. (Doc. 105, at 21-22.) The Court addresses each Count below.[22]

      a. *Count II*

As for Count II, Plaintiffs allege they are entitled to payment of Invoice 7521 under the Vogtle Subcontract because WECTEC found the completed work acceptable and paid the invoice, "but SNC improperly reversed the payment." (<u>Id.</u> at 21.) Defendants argue Invoice 7521 is a post-petition activity and the Vogtle Subcontract was not assumed, so Plaintiffs are not entitled to summary judgment on Count II. (Doc. 148, at 7-9.) In response, Plaintiffs argue that "if the debtor-in-possession elect[ed] to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." (Doc. 166, at 5-6 (quoting <u>N.L.R.B. v. Bildisco and Bildisco</u>, 465 U.S. 513, 531 (1984)) (citation and quotation omitted).)

As discussed above, it is undisputed that Invoice 7521 was for work completed after the petition date. When a bankruptcy

---

[22] As to Plaintiffs' Count II, the Vogtle Defendants incorporates WECTEC's arguments in their brief. (Doc. 146, at 4.) Additionally, the Court notes that under the Stipulation, the Owners agreed to defend and indemnify WECTEC against Plaintiffs' claims related to the Vogtle Project asserted against WECTEC. Accordingly, the Court will once again refer to the Vogtle Defendants and WECTEC collectively as "Defendants" in addressing Plaintiffs' Count II, even though Count II is against WECTEC.

petition is filed, pre-petition executory contracts "remain in existence and are enforceable by the debtor but not against the debtor." In re Friedman's Inc., 372 B.R. 530, 548 (Bankr. S.D. Ga. 2007) (citations and quotations omitted). Therefore, unless WECTEC assumed the Vogtle Subcontract, Plaintiffs would not be able to bring a breach of contract against WECTEC. However, the Court is unconvinced by Plaintiffs' argument that WECTEC elected to receive benefits and breached the Vogtle Subcontract by failing to pay Invoice 7521. Plaintiffs do not point to any facts that show WECTEC elected to continue, and to the extent they seek to rely on the arguments raised for Plaintiffs' Count I, there is a material dispute as to whether the work done under Invoice 7521 benefited WECTEC. As a result, Plaintiffs' motion for summary judgment as to Count II (Doc. 104) is **DENIED**.

    b. *Count VI*

As for Count VI, Plaintiffs argue they are entitled to payment for the Bridge Agreement Invoices because they performed the work described in the invoices. (Doc. 105, at 22.) Moreover, Plaintiffs allege "SNC pre-approved every invoice before submission" and never complained about the invoices. (Id.) Plaintiffs also argue that even though SNC terminated the Bridge Agreement, Section 8.c of the agreement itself provides for "complete, full, and final settlement for such terminated work." (Id. (citing Doc. 192, at 4).)

The Vogtle Defendants argue that Plaintiffs are not entitled to summary judgment on Count VI because Plaintiffs breached the Vogtle Subcontract and Bridge Agreement "by providing and installing defective [Bus System Goods]" and "by installing structural steel in violation of approved-for-construction drawings."[23] (Doc. 146, at 6.) The Vogtle Defendants argue that because of Plaintiffs' breach, certain provisions in the Vogtle Subcontract and Bridge Agreement allow them to offset and back charge amounts owed by Plaintiffs for the alleged defects, and whether they are entitled to offset and back charge amounts are questions of fact for the jury. (Id. at 6-8.) Plaintiffs argue the Bus System Goods were not defective, but regardless, the condition of the Bus System Goods is irrelevant under the Vogtle Subcontract and Bridge Agreement because the Bus System Goods were provided under the Purchase Orders. (Doc. 161, at 20-21.) Instead, according to Plaintiffs, the Vogtle Subcontract and Bridge Agreement only covered the installation of the electrical bus system, and there was no evidence that defective Bus System Goods were actually installed. (Id. at 21.) Moreover, Plaintiffs argue the Vogtle Defendants are not entitled to offset and back

---

[23] Count VI is for breach of the Bridge Agreement, but the relevant provisions the Vogtle Defendants bring their claims under are in the Vogtle Subcontract and incorporated into the Bridge Agreement. (Doc. 146, at 5-6.) Therefore, the Parties raise arguments for both contracts collectively, and for purposes of this analysis, the Court will address the Subcontract and Bridge Agreement together.

charge because the Bridge Agreement was terminated.   (<u>Id.</u> at 21-22.)

Rather than refuting the Vogtle Defendants' argument regarding installation of structural steel, Plaintiffs "admit that this type claim, if shown, . . . would actually be presented under the [Vogtle] Subcontract and Bridge Agreement . . . [, but the] Vogtle Defendants do not have a proper claim here for such alleged breaches." (<u>Id.</u> at 21.)   Because the Vogtle Defendants put forth evidence that Plaintiffs may have breached by installing structural steel in violation of the approved-for-construction drawings and Plaintiffs do not provide evidence to the contrary, there is a genuine dispute of material fact and Plaintiffs' motion for summary judgment as to Plaintiffs' Count VI (Doc. 104) is **DENIED**.

**B. Vogtle Defendants' Counterclaims**

    1.   <u>Breach of Warranty in Vogtle Subcontract (Vogtle Defendants' Count I and II)</u>[24]

Plaintiffs move for summary judgment on the Vogtle Defendants' Count I and Count II, which both relate to the breach of warranty in the Vogtle Subcontract.   (Doc. 105, at 44-50.)   The Vogtle Defendants move for partial summary judgment on duty and breach for both Counts I and II.   (Doc. 122, at 46-52.)

---

[24] Although Count II refers to WECTEC, this claim is brought by the Vogtle Defendants pursuant to the Stipulation.

Plaintiffs argue summary judgment should be granted in their favor because the Vogtle Defendants have no standing under the Vogtle Subcontract and therefore cannot bring Count I and II against them. (Doc. 139, at 40-41.) Plaintiffs argue that even if the Vogtle Defendants have standing, they still cannot bring these claims because (1) WECTEC rejected the Vogtle Subcontract during the bankruptcy and (2) the Vogtle Subcontract was superseded and discharged by the Bridge Agreement. (Doc. 161, at 49.) The Vogtle Defendants argue that WECTEC's rejection has no effect on their standing, the Bridge Agreement did not supersede, and WECTEC assigned all warranty claims under the Vogtle Subcontract against Plaintiffs. (Doc. 167, at 20-22.)

The Court first addresses whether the Vogtle Defendants have standing to bring these claims. As the Vogtle Defendants correctly point out, the Bankruptcy Court's order preserved the claims despite WECTEC's rejection of the Vogtle Subcontract. (Doc. 146, at 39.) Therefore, Plaintiffs' argument related to the rejection of the Vogtle Subcontract fails. As for Plaintiffs' argument that the Bridge Agreement superseded and discharged the Vogtle Subcontract, the Court does not agree with Plaintiffs because these two contracts are not between the same parties, which is required to supersede and discharge a previous contract. See FieldTurf USA Inc. v. TenCate Thiolon Middle East, 945 F. Supp. 2d 1379, 1400 (N.D. Ga. 2013) ("When multiple contracts are entered into by the

same parties at different times, [a]n existing contract is superseded and discharged whenever the parties subsequently enter upon a valid and inconsistent agreement completely covering the subject-matter embraced by the original contract." (citations and quotations omitted)).   Importantly, the Stipulation clearly assigned the Vogtle Defendants "warranties related to services performed or goods provided by the Plaintiffs for the Vogtle Project ('Warranties') to the Vogtle Owners."   (Doc. 8-4, at 5.) Therefore, the Vogtle Defendants have standing to bring these claims.[25]

The Court now turns to what duty Plaintiffs owed to the Vogtle Defendants under the Vogtle Subcontract.   The Vogtle Defendants argue that Plaintiffs' duty was "to provide, install, and construct an electrical bus system that had a [NSPB] system with aluminum bus bars coated with epoxy resin that did not delaminate or crack." (Doc. 122, at 50.)   According to the Vogtle Defendants, Plaintiffs breached this duty "by providing and installing an electrical bus system containing [NSPB] bars with epoxy delamination and/or cracking." (Id. at 48.)   Plaintiffs contend the Vogtle Subcontract does not warrant the bus bars already purchased under the Purchase

---

[25] The Vogtle Defendants contend that Plaintiffs do not dispute their status as third-party beneficiaries (Doc. 146, at 38 n.18); however, Plaintiffs argue that the Vogtle Defendants are not third-party beneficiaries (Doc. 161, at 48-49).   Because the Court finds that Vogtle Defendants have standing to bring these claims under the Vogtle Subcontract, it does not address the third-party beneficiary argument.

Order, and therefore, there is no duty that relates to the condition of those bus bars under the Vogtle Subcontract. (Doc. 139, at 50-52.) As for the installation, Plaintiffs argue there is no evidence they ever installed defective bus bars. (Id. at 53-54.) Plaintiffs also argue that the Vogtle Defendants rely on the opinion of Mr. Britton for the proposition that the bus bars were defective, but his opinion should be excluded. (Id. at 53.)

The first question is whether the Vogtle Subcontract covers the condition of Bus System Goods. Applying the statutory contract construction rule related to general and specific terms, Plaintiffs argue "Attachment A – Scope of Work" provides a more specific definition of "Work" that does not mention the Bus System Goods, and therefore, the more specific language should govern over the general language.[26] (Doc. 105, at 47-49.) Plaintiffs also argue the Vogtle Subcontract does not incorporate the Purchase Orders. (Id. at 48.) The Vogtle Defendants respond that Plaintiffs "avoid the plain language of the [Vogtle] Subcontract's warranty and scope." (Doc. 146, at 41.) The Vogtle Defendants argue Plaintiffs incorrectly apply the statutory contract construction rule because that rule only applies when a term is ambiguous. (Id. at 41-42.) Looking at the contract as a whole,

---

[26] Plaintiffs also argue that "Attachment B – Price & Payment" shows that no new Bus System Goods were provided under the Vogtle Subcontract. (Doc. 105, at 48.) But the Court agrees with the Vogtle Defendants that the lack of payment for the material does not modify the definition of "Work" under the Vogtle Subcontract. (Doc. 146, at 44.)

the Court finds that "Work" under the Vogtle Subcontract covers the bus system materials.  The Vogtle Subcontract defines "Work" as:

> [A]ll the resources including Goods, Labor, Construction Works, Materials and Equipment, Services, supervision, and management required by this Subcontract, whether provided by Subcontractor or provided to Subcontractor by Company, Owner, or others in order to fulfill Subcontractor's obligations under this Subcontract. Work also includes all duties, responsibilities, and other obligations undertaken by Subcontractor under this Subcontract, whether expressed or implied.

(Doc. 195-1, at 8.)  "Materials and Equipment" are defined as:

> [A]ll materials, commodities, supplies, apparatus, equipment, and machinery that Subcontractor is obligated to provide and install and which will become a permanent part of the Project when it is completed.

(Id. at 7.)  The Vogtle Subcontract expressly provides a warranty for the "Materials and Equipment."  (Id. at 13.)  Because the contract construction rule applies only where there is an ambiguity, and the Court finds that "Work" is not ambiguous, the contract construction rule is inapplicable here.  See Emory Healthcare, Inc. v. Farrall, 859 S.E.2d 576, 625 (Ga. Ct. App. 2021).  Moreover, as the Vogtle Defendants point out, Section 2.1.1 of Attachment A "refers to the [NSPB] duct and [IPB] as [Plaintiffs'] equipment."  (Doc. 146, at 43 (citing Doc. 195-1, at 40) (quotation omitted).)  The Vogtle Defendants also point out Section 2.1.3(e) to illustrate there is no "Company Provided Material" for Plaintiffs' scope of work, and Section 2.3(a) to

show a list of equipment "Company" would provide, and how that it does not include any Bus System Goods. (Id. (citing Doc. 195-1, at 40, 45.).) Based on this clear provision and unambiguous language, the Court finds the Vogtle Subcontract covers the condition of the Bus System Goods, and therefore, Plaintiffs owed a duty under the Vogtle Subcontract to provide non-defective electrical bus system materials to the Vogtle Defendants as part of their installation obligations.

Because there was a duty owed, the Court now addresses whether there was a breach of that duty. The Vogtle Defendants argue Plaintiffs breached their duty by providing bus bars that were delaminated and cracked which "resulted in an electrical bus system that was not free from defect and did not conform to the requirement of the [Vogtle] Subcontract or industry standards." (Doc. 122, 51-52.) Plaintiffs argue the bus system materials were not covered by the Vogtle Subcontract, but the Court rejected that argument above. (See Doc. 139, at 50-52.) Plaintiffs also argue that the Vogtle Defendants' allegation that Plaintiffs performed defective installation is based on the allegation that the bus bars were defective, and there is a factual dispute as to whether the bus bars were defective and could not be used in the electrical bus system. (Id. at 53-43.) The Court agrees with Plaintiffs because there is a material dispute as to whether bus bars with delamination and cracking are defective based on the Vogtle

86

Defendants' expert Dr. Kattamis' opinion on the consequences of using bus bars with delamination and cracking and Plaintiffs' expert Dr. Cooke's opinion rebutting the same.   Therefore, the Court cannot determine whether there was a breach of the duty owed by Plaintiffs under the Vogtle Subcontract.   Accordingly, Plaintiffs' motion for summary judgment on the Vogtle Defendants' Count I and Count II (Doc. 104) is **DENIED**, and the Vogtle Defendants' motion for partial summary judgment on Count I and Count II (Doc. 116) is **GRANTED IN PART** as to duty and **DENIED IN PART** as to breach.

### 2. Breach of Warranty in Bridge Agreement (Vogtle Defendants' Count III)

Plaintiffs move for summary judgment on the Vogtle Defendants' Count III, which relates to the breach of warranty in the Bridge Agreement.   (Doc. 105, at 52-54.)   The Vogtle Defendants simultaneously move for partial summary judgment on duty and breach for Count III.   (Doc. 122, at 52.)

First, Plaintiffs argue the Vogtle Defendants are unable to maintain this claim against Plaintiffs because the termination of the Bridge Agreement released them from all liability.   (Doc. 105, at 52-54.)   In response, the Vogtle Defendants argue the liability is released "only as it relates to the termination for convenience."   (Doc. 146, at 49.)   Moreover, the Vogtle Defendants contend that Plaintiffs' interpretation of the liability release

provision is so broad that it would prevent Plaintiffs from bringing their own breach of contract claims under the Bridge Agreement. (Id.) The relevant provision in the Bridge Agreement provides:

> 8. Either Party may terminate this Agreement for convenience at any time by giving prior written notice of at least thirty (30) days to the other Party specifying the extent and the effective date of such termination.
>
> > a. If Either Party shall terminate this Agreement, then Subcontractor shall cease operations on the Project, but shall also take all actions necessary for the protection and preservation of the Work. If only certain portions of the Work have been terminated, then Subcontractor shall continue to perform the portion of the Work not terminated.
> >
> > b. Subcontractor, if and to the extent requested to do so by SNC, shall promptly assign to SNC, or to a third party designed by SNC, in form and content satisfactory to SNC, Subcontractor's rights, title and interest to the Work.
> >
> > c. As complete, full and final settlement for such terminated Work, Subcontractor shall be entitled to payment from SNC for (i) the amount that is due and owing to Subcontractor pursuant to agreed unit rates or for any other service or material rates as referenced in Section 4 above satisfactorily performed under and from the Effective date of this Agreement, for Work performed under and from the Effective Date of this Agreement prior to the effective date of termination of this Agreement and (ii) the reasonable and direct costs incurred by Subcontractor to terminate its own Project-specific subcontracts, purchase orders and supply agreements, and any on-site rental agreements and leases.
> >
> > d. Neither Party shall have any liability to the other Party in the event of such termination except as provided for in Paragraph b. above.

(Doc. 192, at 4.)   The Court finds there is no ambiguity in the termination for convenience clause; therefore, the Court will look to the contract to determine the intent of the Parties.   See 4 G Props., LLC v. GALS Real Est., Inc., 656 S.E.2d 922, 923 (Ga. Ct. App. 2008).   The Court finds that the termination discharged Plaintiffs and the Vogtle Defendants from their unperformed obligations under the Bridge Agreement, other than from the obligation created by Paragraph b if requested.   As the Vogtle Defendants point out, adopting Plaintiffs' interpretation of the contract would effectively bar both Parties from bringing their respective claims under the Bridge Agreement.   Therefore, the termination of the Bridge Agreement does not affect the liability of the Parties for any breach that occurred prior to the termination.

Finding that the termination of the Bridge Agreement did not release all liability, the Court addresses whether the Vogtle Defendants are entitled to partial summary judgment on duty and breach for their breach of warranty claim.   The Vogtle Defendants raise the same arguments for duty and breach as their Vogtle Subcontract claim because the relevant provisions that they bring their claims under are in the Vogtle Subcontract and incorporated into the Bridge Agreement.   (See Doc. 122, at 52.)   Plaintiffs raise the same arguments in response.   (Doc. 139, at 55.)

Therefore, as discussed above under Section IV.B.1, the Court finds that Plaintiffs owed a duty to the Vogtle Defendants but finds there is a genuine dispute of material fact as to whether that duty was breached. Accordingly, Plaintiffs' motion for summary judgment as to Vogtle Defendants' Count III (Doc. 104) is **DENIED**,[27] and the Vogtle Defendants' motion for partial summary judgment on Count III (Doc. 116) is **GRANTED IN PART** as to duty and **DENIED IN PART** as to breach.

### 3. Breach of the Purchase Orders (Vogtle Defendants' Count VII and VIII)[28]

Plaintiffs move for summary judgment on the Vogtle Defendants' Counts VII and VIII, which both relate to the breach of contract and warranty of the Purchase Orders. (Doc. 105, at 24-44.) The Vogtle Defendants move for partial summary judgment on duty and breach for Counts VII and VIII. (Doc. 122, at 33-46.)

As an initial matter, Plaintiffs raise two arguments for why summary judgment should be granted in their favor: (1) the Vogtle Defendants have no standing under the Purchase Orders to bring their claims and (2) even if the Vogtle Defendants have standing, the statute of limitations and acceptance of goods under the UCC

---

[27] Plaintiffs argue that at a minimum they are seeking partial summary judgment on all claims and damages arising after the termination of the Bridge Agreement, and summary judgment as to "the claim that Plaintiffs are liable for completion costs of the installation beyond the repair of any work they allegedly performed improperly prior to termination." (Doc. 105, at 58-59.) Based on the discussion regarding the termination clause in the Bridge Agreement, the Court **DENIES** Plaintiffs' request.

[28] Although Count VIII refers to WECTEC, this claim is brought by the Vogtle Defendants pursuant to the Stipulation.

bars these claims.  (Doc. 105, at 27-33.)  In response, the Vogtle
Defendants argue (1) they have standing as either assignees or
third-party beneficiaries and (2) the UCC does not apply, but even
if it did, the statute of limitations and acceptance would not bar
their claims.  (Doc. 146, at 8-13, 15-30.)  The Court addresses
each of Plaintiffs' arguments below before addressing the Vogtle
Defendants' arguments for duty and breach.

       a. *Standing*

     Starting with Plaintiffs' first argument, Plaintiffs contend
WECTEC could not have assigned any rights under the Purchase Orders
through the Stipulation because WECTEC itself never had rights.
(Doc. 105, at 29-32.)  According to the Vogtle Defendants, the
Purchase Orders were originally entered between Calvert and S&W,
and S&W was acquired by Shaw years prior.  (Doc. 146, at 9.)  CB&I
acquired Shaw/S&W, and merged the two entities into an existing
CB&I subsidiary, Crystal Acquisition Subsidiary, Inc.  (Id.)  "As
part of the merger, all property and rights of Shaw/S&W, including
the four Purchase Orders with Calvert, automatically vested with
Shaw/S&W as the surviving entity and as a subsidiary of CB&I."
(Id.)  Therefore, when CB&I acquired Shaw/S&W, it "acquired all
rights, obligations, and liabilities related to the Purchase
Orders." (Id. at 10.)  On December 31, 2015, Westinghouse acquired
S&W/CB&I and placed it within Westinghouse subsidiary, WECTEC.
(Id.)  Through this acquisition, WECTEC received "all rights,

obligations, and liabilities related to the Purchase Orders." (Id. at 11.)   Plaintiffs argue these mergers and acquisitions "do not support the assertion that any rights in these specific contracts passed from one party to the other" because the express terms of the Purchase Orders required written notice for Shaw to assign their rights.   (Doc. 161, at 23.)   However, the Court disagrees with Plaintiffs because the mergers and acquisitions were transfers by operation of law, not assignments, and therefore did not require prior written notice.[29]   See Technidata Am., LLC v. SciQuest, Inc., No. CV 2007-1754, 2008 WL 11366419, at *1 (D. Md. Mar. 24, 2008) (finding that a merger "caused a transfer by operation of law that did not violate the anti-assignment provision.").

Plaintiffs argue that even if WECTEC did have rights under the Purchase Orders, the Vogtle Defendants did not receive the right to bring these claims under the Stipulation because it does not reference the Purchase Orders.   (Doc. 161, at 23-24.)   Again, the Court agrees with the Vogtle Defendants that even though the

---

[29] Plaintiffs also argue that even if there was a valid assignment, WECTEC is estopped from asserting that it had causes of action under the Purchase Orders because it did not list it as an asset in the bankruptcy estate.   (Doc. 105, at 42-43.)   The Vogtle Defendants argue "judicial estoppel would be unwarranted because WECTEC (a) did not take any clearly inconsistent positions and (b) did not seek to deceive or coldly manipulate the bankruptcy court."   (Doc. 146, at 33-37.)   The Court agrees with the Vogtle Defendants that WECTEC did not represent to the bankruptcy court that it "possessed no valuable claim for damages against" Plaintiffs based on the schedules of assets and liabilities submitted.   (Id. at 35.)   Therefore, Plaintiffs' arguments on judicial estoppel as it relates to Purchase Orders fails.

Stipulation does not mention the Purchase Orders, it clearly "assigned all warranties related to 'services performed or goods provided for the Vogtle Project'" and "claims against Plaintiffs related to services performed or goods provided for the Vogtle Project on or after the Petition Date." (Doc. 177, at 13 (citing AZZ, Inc., et al, No. 18-01016, Doc. 14).) Accordingly, the Vogtle Defendants have standing to bring all warranty claims and other breach claims related to goods and services provided after the petition date.[30]

  b. *UCC*

Turning to Plaintiffs' second argument, they contend that even if the Vogtle Defendants have standing to bring these claims under the Purchase Orders, the UCC adopted by North Carolina applies, and therefore the claims are barred by the statute of limitations, the acceptance of the goods, and the lack of notice. (Doc. 105, at 32-41.) The Vogtle Defendants argue the UCC does not apply because the Purchase Orders expressly state that the UCC does not govern the agreement. (Doc. 146, at 15-16.) The Purchase Orders' "Applicable Law" provision states, in part:

> This Agreement . . . shall be governed by and
> interpreted in accordance with the laws of the State of

---

[30] Lastly, Plaintiffs argue the Vogtle Defendants are not third-party beneficiaries to the Purchase Orders. (Doc. 105, at 27-29.) The Vogtle Defendants contend that the Purchase Orders were made for the direct benefit of them and allowed for them "to be actively involved in the performance under the Purchase Orders." (Doc. 146, at 12.) However, because the Vogtle Defendants have standing as a result of WECTEC's assignment, the Court does not address the third-party beneficiary arguments at this time.

> North Carolina excluding its conflict of law rules.  The
> Parties agree that the UCC code . . . shall not govern
> this Agreement nor the rights and obligations of the
> Parties.

(Doc. 195-2, at 68.)  Plaintiffs argue this exclusion regarding

the UCC only applies to the model UCC and not the UCC as adopted

by North Carolina.  (Doc. 105, at 26-27.)  Both Parties agree the

model UCC does not have the force of law, but they disagree as to

the effect this has on whether the Purchase Orders expressly

exclude the UCC as adopted by North Carolina.  (Doc. 161, at 7;

Doc. 177, at 15.)  Plaintiffs contend the Parties would expressly

exclude the model UCC because it does not have the force of law.

(Doc. 161, at 7.)  The Vogtle Defendants contend that because the

model UCC has no force of law, it would render this exclusion

meaningless, and further argue, the codified UCC in North Carolina

provides that the "effect of provisions in this Chapter may be

varied by agreement."  (Doc. 177, at 15 (citing N.C. Gen. Stat. §

25-1-302(a)) (quotation omitted).)  The Court agrees with the

Vogtle Defendants that the Applicable Law provision that relates

to the UCC would be rendered meaningless if interpreted how

Plaintiff suggests, and therefore, the Court finds the Parties

intended to exclude the codified UCC from applying to the Purchase

Orders.  See Malone v. Barnette, 772 S.E.2d 256, 262 (N.C. Ct.

App. 2015) ("Basic rules of construction applicable to contracts

precludes an interpretation rendering such language in the

parties' agreement purposeless."). Accordingly, Plaintiffs' statute of limitations, acceptance, and lack of notice arguments are not applicable. Because the Vogtle Defendants have standing and the UCC does not apply, the Court addresses whether Plaintiffs owed the Vogtle Defendants a duty and whether that duty was breached.

> c. *Duty and Breach*

The Vogtle Defendants argue that Plaintiffs breached provisions in the Purchase Orders related to the performance standards, warranty, and design specification. (Doc. 122, at 36-46.) Other than the lack of standing arguments, Plaintiffs raise no other arguments that there was no duty. Therefore, based on the contract provisions that the Vogtle Defendants cite to, the Court finds Plaintiffs owed the Vogtle Defendants a duty as required by the relevant Purchase Order provisions. The Court now determines whether there was a breach of that duty.

First, Plaintiffs argue there is no breach of the IPB Purchase Orders because there is no evidence the IPB goods were defective. (Doc. 105, at 33-34.) The Vogtle Defendants argue the IPB goods are interconnected with the NSPB goods to make the electrical bus system, and therefore, "the defective [NSPB goods] caused the [IPB goods] to not be 'suitable for the work' as the design required." (Doc. 146, at 14 (citation omitted).) The Court agrees with Plaintiffs because as Plaintiffs note, the "Vogtle Defendants do

not assert that [Plaintiffs] breached any terms of the IPB []
Purchase Orders," but rely on the "interconnectedness" of the IPB
goods with the NSPB goods to maintain their claims. (Doc. 161, at
26.)  Without any evidence that the IPB goods themselves were
defective, the Court finds no breach of the independent IPB
Purchase Orders.

Turning to the NSPB Purchase Orders, the Vogtle Defendants
argue that Plaintiffs breached their duties by providing NSPB bars
with delaminated and/or cracked epoxy coatings. (Doc. 122, at 40-
46.)  The Vogtle Defendants contend the delamination and cracking
rendered the bus bars defective in breach of the Purchase Order
provisions by relying on several of its admissible expert opinions.
(Id.)  The crux of Plaintiffs' response is that there was no breach
of the Purchase Orders because delamination and cracking of the
epoxy does not render the bus bars defective. (Doc. 139, at 44-
48.)  Plaintiffs support their argument by citing to testimony and
the record.[31]  (Id.)  As explained above, based on the admissible
expert opinions and the record, there is a question of fact as to
whether a bus bar with delamination and/or cracked epoxy is
rendered defective and constitutes a breach of the Purchase Orders.
Plaintiffs argue that even if there was a breach, the warranty

---

[31] Plaintiffs also raise arguments about causation, but because the Vogtle
Defendants are not seeking partial summary judgment on this element and because
the Court denies Plaintiffs' summary judgment on other grounds, the Court does
not address these arguments at this time. (See Doc. 139, at 48-50.)

period does not allow for the Vogtle Defendants to recover under the Purchase Orders. (Doc. 105, at 38-41.) Plaintiffs contend the warranty provision in the Purchase Orders required notice to be given to Plaintiffs within the warranty period. (Id.) The Vogtle Defendants argue the warranty provisions only required that the material be defective within the warranty period, not that notice be given within that time period. (Doc. 146, at 30-31.) Further, the Vogtle Defendants argue that even if notice was required, Plaintiffs had actual notice of the defect during the warranty period. (Id. at 31-33.) The Court finds that the warranty provision only required that the defect occur within the warranty period, so Plaintiffs' argument that notice of the alleged must be given within the warranty period also fails.

Based on the foregoing, the Court finds that Plaintiffs owed a duty to the Vogtle Defendants under the NSPB Purchase Orders but there is a genuine dispute of material fact to determine whether that duty was breached. Accordingly, Plaintiffs' motion for summary judgment on Count VII and VIII (Doc. 104) is **GRANTED IN PART** as to the IPB Purchase Orders and **DENIED IN PART** as to the NSPB Purchases Orders; and the Vogtle Defendants' motion for partial summary judgment on Vogtle Defendants' Count VII and VIII (Doc. 116) is **GRANTED IN PART** as to duty under the NSPB Purchase Orders and **DENIED IN PART** as to breach and the IPB Purchase Orders.

4. <u>Negligent Construction and Negligent Design (Vogtle Defendants' Count IV and V)</u>

Plaintiffs move for summary judgment on the Vogtle Defendants' Count IV, which is based on Plaintiffs' construction of the Bus System Goods, and Count V, which is based on Plaintiffs' design of those same goods. (Doc. 105, at 50-51.) The Vogtle Defendants move for partial summary judgment on duty and breach for Count IV. (Doc. 122, at 52-55.)

First, Plaintiffs argue they are entitled to summary judgment on the Vogtle Defendants negligence counterclaims[32] for two reasons: (1) the statute of limitations has run and (2) the Vogtle Defendants did not bring a claim under the Purchase Orders. (Doc. 105, at 50-51.) In response to Plaintiffs' first argument, the Vogtle Defendants agree that a four-year statute of limitations applies but disagrees when the cause of action for negligent design accrued. (Doc. 146, at 54.) The Vogtle Defendants assert the time does not begin to run "until the plaintiff suffers pecuniary or economic loss with certainty." (<u>Id.</u> (citing <u>Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.</u>, 479 S.E.2d 727, 730 (Ga. 1997)).) Plaintiffs argue the negligent design claim accrued when the Bus System Goods were manufactured and designed – December

---

[32] The Vogtle Defendants argue that Plaintiffs "conflate the two different negligence claims," but they are two separate legal claims. (Doc. 146, at 52.) The Court agrees the claims are separate, however, this distinction is immaterial to the arguments raised by both sides.

2013 for Unit 3 NSPB goods and sometime between May 2014 and November 2015 for Unit 4 NSPB goods.  (Doc. 105, at 50.)

To determine when the cause of action accrues, courts will "ascertain the time when the plaintiff[s] could first have maintained [their] action to a successful result." U-Haul Co. of W. Ga. v. Abreu & Robeson, Inc., 277 S.E.2d 497, 499 (Ga. 1981) (citations and quotations omitted).  According to the Vogtle Defendants, the earliest they could have maintained their action was in late 2016 or 2017, when installation began, and they discovered the delamination and cracking on the bus bars.  (Doc. 177, at 28-29.)  The Vogtle Defendants contend that prior to the installation, "the inspection fell under Shaw's (now WECTEC's) purview," and thus, they would not have been able to maintain an action at the time Plaintiffs claim the Bus System Goods were manufactured and designed.  (Id. at 28.)  The Court agrees that the Vogtle Defendants could not have maintained their action until installation began in late 2016 because the inspection of the bus bars fell under the purview of other entities, and it was not until installation began that the Vogtle Defendants would have used the bus bars.  Therefore, the negligent design claim is not time barred.[33]  Turning to Plaintiffs' second argument, the Vogtle

---

[33] To the extent Plaintiffs assert the statute of limitations bars the negligent construction claim, the Vogtle Defendants correctly assert the limitations period for a negligent construction claim begins to run when the construction is substantially completed.  (Doc. 146, at 54 n.29 (citing Travis Pruitt & Assocs., P.C. v. Bowling, 518 S.E.2d 453, 454 (Ga. Ct. App. 1999)).)  Therefore,

Defendants argue that negligent construction and negligent design claims are independent from a breach of contract claim. (Doc. 146, at 53-54.) The Court agrees with the Vogtle Defendants because negligent construction and negligent design claims are "not from a breach of contract claim but from a breach of duty implied by law to perform the work in accordance with industry standards." Jai Ganesh Lodging, Inc. v. David M. Smith, Inc., 760 S.E.2d 718, 724 (Ga. Ct. App. 2014). Therefore, Plaintiffs' arguments that the Vogtle Defendants "seek to shoehorn these claims into the [Vogtle] Subcontract's general definition of 'Work'" is both irrelevant and unsuccessful. (See Doc. 105, at 50.)

The Court now turns to whether the Vogtle Defendants are entitled to partial summary judgment on the duty and breach elements of their negligent construction claim. The Vogtle Defendants argue they are entitled to partial summary judgment because Plaintiffs owed duties related to the construction of the electrical bus system and breached those duties. (Doc. 122 at 54-55.) Plaintiffs argue similar arguments from their motion for summary judgment, primarily that the claim is barred by the statute of limitations and that the Vogtle Defendants lack standing. (Doc.

---

the negligent construction claim that relates to the installation that began in late 2016 is also not time barred because even if the Court were to assume the installation was substantially complete as soon as it began, the claim would not be time barred until late 2020, which is after when the Vogtle Defendants filed their claim on January 2, 2020.

139, at 58-59.)    However, the Court has already rejected Plaintiffs' arguments above.

Under Georgia law, "[a] negligent construction claim arises not from a breach of contract claim but from [a] breach of a duty implied by law to perform the work in accordance with industry standards." Rowe v. Akin & Flanders, Inc., 525 S.E.2d 123, 126 (Ga. Ct. App. 1999) (citations omitted). "The law imposes upon building contractors and others performing skilled services the obligation to exercise a reasonable degree of . . . care and skill as, under similar conditions and like surrounding circumstances, is ordinarily employed by others of the same profession." Schofield Interior Contractors, Inc. v. Standard Bldg. Co., 668 S.E.2d 316, 318 (Ga. Ct. App. 2008) (citations omitted). The party bringing the negligent construction claim "must establish the standard of care applicable to the [opposing party] by the introduction of expert testimony." Bilt Rite of Augusta, Inc. v. Gardner, 472 S.E.2d 709, 710 (Ga. Ct. App. 1996).

Here, the Vogtle Defendants offer Mr. Britton as an expert to establish that the relevant standard of care is "contractors must perform their work in a professional manner that is free of defects and consistent with quality workmanship."    (Doc. 122, at 54 (citation omitted).)    The Vogtle Defendants further argue that this standard of care requires "a contractor to conform to all written specifications and construction drawings," and that it is

101

"well-accepted in the construction industry that a contractor should not install material that it knew, or should have known, was defective or of poor quality that could result in a failure over time." (Id.) The Court, having found that Mr. Britton is qualified to opine on the industry standards, finds the Vogtle Defendants have established a duty owed by Plaintiff. However, the Court further finds that there is a question of fact as to whether Plaintiffs breached this duty. While there is evidence the bus bars were delaminated and cracked, as stated above, there is still a question as to whether this constitutes a defect. Therefore, the Court finds Plaintiffs owed a duty to the Vogtle Defendants, but there is a question of fact as to whether that duty was breached. Accordingly, Plaintiffs' motion for summary judgment on the Vogtle Defendants' Count IV and Count V (Doc. 104) is **DENIED** and the Vogtle Defendants' motion for partial summary judgment as to Count IV (Doc. 116) is **DENIED IN PART** as to breach and **GRANTED IN PART** as to duty.

### 5. Attorneys' Fees (Vogtle Defendants' Count VI)

Plaintiffs move for summary judgment on the Vogtle Defendants' Count VI. (Doc. 105, at 54-55.) O.C.G.A. § 13-6-11 allows for an award of attorneys' fees where a defendant is shown to have acted in bad faith, have been stubbornly litigious, or caused a plaintiff unnecessary trouble and expense. A party is precluded from recovering attorneys' fees based on "stubborn

litigiousness" and "causing the plaintiff unnecessary trouble and expense" where there is a bona fide dispute.  <u>Jeff Goolsby Homes Corp. v. Smith</u>, 308 S.E.2d 564, 567 (Ga. Ct. App. 1983) (citations and quotations omitted).

Plaintiffs argue there is a bona fide dispute, so the Vogtle Defendants are not entitled to attorneys' fees.  (Doc. 105, at 54.)  Additionally, Plaintiffs again argue the termination of the Bridge Agreement released all liability.  (<u>Id.</u> at 54-55.)  In response, the Vogtle Defendants assert that Plaintiffs' termination of the Bridge Agreement argument fails for the reasons discussed under the claims under the Bridge Agreement, and the Court agrees.  (<u>See</u> Doc. 146, at 55.)  As for Plaintiffs' bona fide dispute argument, the Vogtle Defendants assert the argument does not apply to attorneys' fees claims based on bad faith.  (<u>Id.</u> (citing <u>Stargate Software Int'l, Inc. v. Rumph</u>, 482 S.E.2d 498, 503 (Ga. Ct. App. 1997)).)  The Vogtle Defendants contend there is evidence that shows Plaintiffs acted in bad faith in the relationship with them and the predecessors in interest.  (<u>Id.</u> (citing Doc. 116-1, at 17-18, 19, 24; Doc. 128-5).)  Based on the evidence cited by the Vogtle Defendants, the Court finds there is a dispute as to whether Plaintiffs acted in bad faith when they did not notify the Vogtle Defendants about the alleged defects in the bus bars.

As for the attorneys' fees claims based on stubborn litigiousness and unnecessary trouble and expense, the Vogtle Defendants argue that whether there is a bona fide dispute is typically a question for the jury. (Id. at 56 (citing Horton v. Dennis, 750 S.E.2d 493, 497 (Ga. Ct. App. 2013)).) The Vogtle Defendants argue that even if it is not a question for the jury, Plaintiffs' arguments do not present a bona fide dispute because their defenses to the Vogtle Defendants' claims fail. (Id.) While the Court recognizes whether a bona fide controversy exists is typically a question for the jury, "if a bona fide controversy clearly exists between the parties, there is not any evidence to support an award based on stubborn litigiousness" and summary judgment would be proper. Nash v. Reed, 825 S.E.2d 853, 857 (Ga. Ct. App. 2019) (citation and quotation omitted). Here, a bona fide controversy exists because for example, Plaintiffs claim the bus bars with delaminated and/or cracked epoxy was not defective but the Vogtle Defendants claim such bus bars are defective. This genuine material dispute between the parties creates a bona fide controversy, and therefore, Plaintiffs' summary judgment on the Vogtle Defendants' attorneys' fees claim based on stubborn litigiousness and unnecessary trouble and expense is proper. Accordingly, Plaintiffs' motion for summary judgment on the Vogtle Defendants' Count VI (Doc. 104) is **GRANTED IN PART** for attorneys'

fees based on stubborn litigiousness and unnecessary trouble and expense and **DENIED IN PART** for attorneys' fees based on bad faith.

### 6. Vogtle Defendants' Damages

Plaintiffs move for summary judgment on all or part of the Vogtle Defendants' damage claims. (Doc. 105, at 55-59.) Plaintiffs argue the damages the Vogtle Defendants seek exceed the amount permitted under the contracts and the amounts are too speculative. (Id. at 55.) The Vogtle Defendants agree the Purchase Orders, Vogtle Subcontract, and Bridge Agreement limitations apply to the amount they can recover, except for the negligent design and negligent construction claims. (Doc. 146, at 59-60.) However, the Vogtle Defendants contend that "[w]here the injured party has established sufficient evidence of damages, any arguments to reasonableness or proportionality are for the jury's consideration," and the damages they seek are not too speculative based on Mr. Tierney's expert report. (Id. at 60.) The Court finds that based upon the evidence provided by the Vogtle Defendants on their breach of contract and negligence claims as discussed above, the jury could reasonably find there was a breach, and thus, the amount of damages is a question for the jury. See Quigley v. Jones, 332 S.E.2d 7, 8, aff'd, 334 S.E.2d 664 (Ga. Ct. App. 1985). Thus, Plaintiffs' motion for summary judgment (Doc. 104) as it relates to the contractual limitations on the Purchase Orders, Vogtle Subcontract, and Bridge Agreement – not the

negligent design and negligent construction claims - is **GRANTED IN PART** and to the extent Plaintiffs seek to limit the Vogtle Defendants' damage claims is **DENIED IN PART.**

## V. CONCLUSION

For the following reasons, Plaintiffs' motion for summary judgment (Doc. 104) is **GRANTED IN PART** and **DENIED IN PART**; Plaintiffs' motion to exclude Mr. Britton (Doc. 108) is **DENIED**; Plaintiffs' motions to exclude Dr. Guyer (Doc. 106) and Dr. Kattamis (Doc. 107) are **GRANTED IN PART** and **DENIED IN PART**; Plaintiffs' motion to exclude Mr. Tierney (Doc. 109) is **DENIED WITHOUT PREJDUICE;** the Vogtle Defendants' motion for summary judgment is **GRANTED** and motion for partial summary judgment (Doc. 116) is **GRANTED IN PART** and **DENIED IN PART**; the Vogtle Defendants' motions to exclude Dr. Cruz (Doc. 112) and Dr. Donohoe (Doc. 113) are **GRANTED;** the Vogtle Defendants' motions to exclude Dr. Cooke (Doc. 111) and Mr. Hoisington (Doc. 114) are **GRANTED IN PART** and **DENIED IN PART;** WECTEC's motions for summary judgment and partial summary judgment (Doc. 119) are **DENIED AS MOOT**; and WECTEC's motions to exclude Dr. Cruz and Dr. Donohoe (Doc. 115) are **GRANTED;** WECTEC's motions to exclude Dr. Cooke and Mr. Hoisington (Doc. 115) is **GRANTED IN PART** and **DENIED IN PART.** The case **SHALL** proceed to trial in due course.

**ORDER ENTERED** at Augusta, Georgia, this 31st day of March, 2023.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA